CPS ENERGY, Time Warner Cable Texas LLC, and Southwestern Bell Telephone Company d/b/a AT&T Texas, Appellants, Public Utility Commission of Texas, Cross-Appellant

v.

PUBLIC UTILITY COMMISSION OF TEXAS, Appellee, CPS Energy, Time Warner Cable Texas LLC, and Southwestern Bell Telephone Company d/b/a AT&T Texas, Cross-Appellees

NO. 03-14-00340-CV

Court of Appeals of Texas, Austin.

Filed: August 31, 2017

Rehearing and Rehearing En Banc Denied August 31, 2017

---

Ms. Kellie E. Billings-Ray, Mr. Douglas Fraser, Assistant Attorney General, Environmental Protection & Admin. Law Division, P. O. Box 12548, MC-066, Austin, TX 78711-2548, Ms. Megan M. Neal, Office of the Attorney General, P. O. Box 12548, Austin, TX 78711-2548, for Appellee.

Mr. Paul A. Drummond, Groce, Locke & Hebdon, 1800 Frost Bank Tower, San Antonio, TX 78205, Mr. Michael T. Sullivan, Mayer Brown LLP, 71 S. Wacker Drive, Chicago, IL 60606, Ms. Melissa A. Lorber, Enoch Kever PLLC, BridgePoint Plaza, 5918 W. Courtyard Dr., Suite 500, Austin, TX 78730, Ms. Valerie P. Kirk, Enoch Kever PLLC, 600 Congress Avenue, Suite 2800, Austin, TX 78701-4039, Ms. Katherine Swaller, 816 Congress Avenue, Ste 1100, Austin, TX 78701-2443, Mr. Alfred R. Herrera, Mr. Brennan Foley, Herrera & Boyle, PLLC, 816 Congress Avenue, Suite 950, Austin, TX 78701, Mr. Curt Daniel Brockmann, P. O. Box 1771, San Antonio, TX 78296-1771, Mr. J. Aaron George, Mr. John Davidson Thomas, Sheppard Mullin Richter & Hampton LLP, 2099 Pennsylvania Avenue NW, Suite 100, Washington, DC 20006, Mr. Lennon G. Briley Jr., 1010 N Saint Marys St Rm 14-J, San Antonio, TX 78215-2109, Mr. Jon David Tate, Mr. Thomas J. Ballo, AT&T Legal Department, 816 Congress Avenue, Suite 1100, Austin, TX 78701, Ms. Patricia Ann Garcia Escobedo, CPS Energy, P. O. Box 1771, San Antonio, TX 78296, for Appellants.

Before Justices Puryear, Pemberton, and Bourland

## OPINION

Cindy Olson Bourland, Justice

We withdraw the opinion and judgment dated February 24, 2017, and substitute the following opinion and judgment in their place. We deny Time Warner Cable Texas LLC's motion for rehearing and en banc reconsideration.

This case concerns the rates charged by a municipally owned utility (MOU), CPS Energy, to telecommunications providers and other entities that attach their network facilities to the utility's poles. The appeal raises issues of first impression arising out of the Public Utility Regulatory Act (PURA). *See generally* Tex. Util. Code §§ 11.001-66.017. Specifically at issue is PURA Section 54.204 and its interaction with federal law and Federal Communications Commission (FCC) rules, as well as the scope of the Commission's jurisdiction over MOUs.

CPS Energy filed a petition with the Public Utility Commission of Texas (Commission or PUC) seeking an order confirming that CPS Energy's method for calculating its pole-attachment rates was reasonable and consistent with PURA and requiring Southwestern Bell Telephone Company d/b/a AT&T Texas (AT&T) and Time Warner Cable Texas LLC (TWC) to pay all outstanding pole-attachment fees. Although AT&T and TWC both had existing agreements with CPS Energy concerning the use of CPS Energy's poles, this dispute developed after the enactment of legislation that prohibits discrimination by MOUs in favor of or against certificated telecommunications providers (CTPs), *see id.* § 54.204(b), and that requires MOUs to charge a rate that does not exceed a maximum-allowable rate and to

charge a uniform rate for pole attachments, *see id.* § 54.204(c).

After a proceeding involving a number of highly contested and complex legal and factual issues that took nearly four years to complete at the Commission level, the Commission determined in its final order that CPS Energy had charged more than the maximum-allowable pole-attachment rate for two years and that it had violated Section 54.204's nondiscrimination and uniform-rate provisions from September 7, 2005 through 2010. The district court affirmed the order in part and reversed it in part. The issues now before us concern the appropriate calculation of the maximum-allowable pole-attachment rate and the application of Section 54.204's nondiscrimination and uniform-rate provisions. As detailed below, we will affirm the judgment of the district court in part, reverse it in part, dismiss for want of jurisdiction in part, and remand the case to the Commission for further proceedings consistent with this opinion.

## BACKGROUND [1]

CPS Energy is an MOU owned by the City of San Antonio, Texas. CPS Energy delivers electricity to its customers through distribution lines attached to poles that it owns in the San Antonio area. Other entities, such as telephone companies and cable companies, including AT&T and TWC, lease space on CPS Energy's poles so that they may attach the wires and cables necessary to provide telecommunications services to area customers. AT&T is a certified telecommunications utility and certificated telecommunications provider (CTP) in Texas. *See id.* § 51.002(10)(A)(1). TWC is a franchised cable operator in San Antonio, Texas, and it is not a CTP. *See id.* § 66.003. CPS

Energy had agreements with both AT&T and TWC regarding the use of CPS Energy's poles.

CPS Energy and AT&T entered into a "Joint Use Pole Contact Agreement" in 1987. The agreement allowed AT&T to attach to CPS Energy's poles and CPS Energy to attach to AT&T's poles. In exchange for attaching to CPS Energy's poles, AT&T agreed to pay an annual attachment fee of $3.75 per pole. The agreement did not allow CPS Energy to adjust the pole-attachment fee, but either party could terminate the agreement upon six months' notice. After termination, the terms and conditions set forth in the agreement remained in full force with respect to all poles that were jointly used by CPS Energy and AT&T as of the termination date. From January 1987 until December 31, 2006, CPS Energy charged AT&T a pole-use fee of $3.75 per pole.

CPS Energy and TWC entered into a pole-attachment agreement in 1984 to allow TWC to provide cable services. The agreement required TWC to apply to CPS Energy for a permit before attaching to CPS Energy's poles. Under the agreement, CPS Energy charged TWC a fee of $3.75 per pole, per year, but CPS Energy could raise the rate with six months' notice. In 2005, TWC began providing telecommunications services in San Antonio in addition to cable services.

Also in 2005, the Texas Legislature amended PURA Section 54.204. As part of an act entitled "Furthering Competition in the Communications Industry," the Legislature amended Section 54.204(b)'s nondiscrimination provision and Section 54.204(c)'s maximum-allowable-rate provision, and it added a uniform-rate provision to Section 54.204(c). The amended statute

1. Unless otherwise noted, the facts in this section are taken from the Commission's un-

challenged findings of fact and undisputed facts in the administrative record.

had an effective date of September 7, 2005, for all provisions except the uniform-rate provision, which had an effective date of September 1, 2006.[2] Under the maximum-allowable-rate provision in Section 54.204(c), MOUs may not charge any entity, regardless of the nature of the services provided by that entity, a pole-attachment rate that exceeds the fee that the MOU would be permitted to charge under rules adopted by the FCC under 47 U.S.C. Section 224(e) if MOUs were regulated under federal law and FCC rules.[3] *See id.* § 54.204(c). The uniform-rate provision in Subsection (c) requires MOUs to charge a single, uniform pole-attachment rate to all entities that are not affiliated with the MOU regardless of the services carried over the networks attached to the poles. *Id.* Subsection (b) provides that an MOU may not discriminate in favor of or against a CTP (like AT&T) regarding pole-attachment rates. *See id.* § 54.204(b). Subsection (d) states: "Notwithstanding any other law, the commission has the jurisdiction necessary to enforce this section." *Id.* § 54.204(d).

In PURA Section 54.204(c), the Texas Legislature directs the Commission to determine an MOU's maximum-allowable pole-attachment rate by referring to the FCC rules adopted under 47 U.S.C. Section 224(e). Section 224(e) required the FCC to prescribe regulations to govern the charges for pole attachments used by telecommunications carriers to provide telecommunications services and mandated that "[s]uch regulations shall ensure that a utility charges just, reasonable, and non-discriminatory rates for pole attachments." 47 U.S.C. § 224(e). The federal statute became effective on February 8, 1996, but it did not apply to MOUs until September 1, 2005, when PURA Section 54.204(c)'s maximum-allowable-rate provision became effective.

As required by 47 U.S.C. Section 224(e), the FCC adopted a formula for calculating the maximum-allowable pole-attachment rate, referred to as the Telecom Formula. The Telecom Formula calculates a utility's historical cost of owning and maintaining poles and then allocates a portion of that cost to each attaching entity based on the amount of space it occupies on the pole. The Telecom Formula is the product of three calculations: a spacing factor, net pole investment, and the carrying charge. To arrive at the maximum-allowable rate under the Telecom Formula, the net cost of a bare utility pole is multiplied by a space-allocation factor (with inputs including space occupied by the attacher and other inputs designed to determine the percentage of usable space occupied by an attacher, such as pole height, pole burial depth, minimum clearance, and the number of attaching entities) and by a carrying-charge factor designed to determine the utility's annual cost of owning and maintaining that pole regardless of the presence of pole attachments. The FCC Telecom Formula is stated as follows:

---

**2.** Act of August 10, 2005, 79th Leg., 2d C.S., ch. 2, § 6, sec. 54.204, 2005 Tex. Gen. Laws 4, 8-9.

**3.** The federal law and FCC rules concerning pole-attachment rates do not otherwise apply to MOUs. *See* 47 U.S.C. § 224(a)(1) (defining "utility" as "any person who is a local exchange carrier or an electric, gas, water, steam, or other public utility, and who owns or controls poles, ducts, conduits, or rights-of-way used, in whole or in part, for any wire communications. Such term does not include any railroad, any person who is cooperatively organized, or any person owned by the Federal Government or any State"), (3) (defining "State" as "any State, territory, or possession of the United States, the District of Columbia, or any political subdivision, agency, or instrumentality thereof"); *see also* 47 C.F.R. § 1.1402(a) (using same definition of "utility"), (g) (using same definition of "State").

$$\begin{bmatrix} Telecom\ Rate \\ per\ Pole \end{bmatrix} = \left[ \frac{\left(\begin{smallmatrix} Space \\ Occupied \end{smallmatrix}\right) + \left(2/3x\ \frac{Unusable\ Space}{No.\ of\ Attaching\ Entities}\right)}{Pole\ Height} \right] \times \frac{Net\ Pole\ Investment}{No.\ of\ Poles} \times \begin{bmatrix} Carrying \\ Charge \\ Rate \end{bmatrix}$$

47 C.F.R. § 1.1409(e).

On September 1, 2006, as required by PURA Section 54.204(c), CPS Energy charged TWC a pole-attachment fee based on CPS Energy's calculation of the maximum-allowable rate under federal law. Beginning in 2007, CPS Energy charged AT&T and TWC the same pole-attachment rate. In 2009, in an effort to comply with the uniform-rate provision of PURA Section 54.204(c), CPS Energy back billed AT&T for additional amounts due for September 1, 2006 (when the uniform-rate provision became effective) through December 31, 2006.

For Test Years 2004-2008/Billing Years 2005-2009,[4] CPS Energy charged to AT&T and TWC the annual pole-attachment rates and received from AT&T and TWC the annual payments set forth below:

**CPS Energy's pole-attachment rates**

| Test Year | Billing Year | CPS Invoiced Rate | | Amount Paid | |
|---|---|---|---|---|---|
| | | AT&T | TWC | AT&T | TWC |
| 2004 | 2005 | $3.75 | $13.52 | $3.75 | $13.52 |
| 2005 | 2006 | $3.75 | $15.63 | $3.75 | $15.63 |
| 2006 | 2007 | $15.63 | $15.63 | $3.75 | $15.63 |
| 2007 | 2008 | $19.82 | $19.82 | $3.75 | $15.63 |
| 2008 | 2009 | $19.82 | $19.82 | $3.75 | $3.75 |

AT&T has not paid CPS Energy's invoiced fees over $3.75. After learning of this, TWC sued CPS Energy in December 2008 in Bexar County District Court, seeking damages and injunctive relief for CPS Energy's alleged discrimination in favor of AT&T and resulting violations of PURA Section 54.204 and alleged breach of contract. About a month after TWC filed suit, in January 2009, CPS Energy filed an enforcement complaint against both AT&T and TWC at the Commission. CPS Energy moved to abate TWC's Bexar County suit on the grounds that the Commission had primary jurisdiction. The Bexar County District Court sustained CPS Energy's plea in abatement and abated the proceeding filed by TWC in March 2009. In No-

4. "Test Year" is the year from which data used to calculate a pole-attachment rate are taken. *See* Tex. Util. Code § 11.003(20) ("'Test year' means the most recent 12 months, beginning on the first day of a calendar or fiscal year quarter, for which operating data for a public utility are available.") "Billing Year" is the calendar year in which a particular pole-attachment rate is actually charged. We will primarily refer to the relevant time period in terms of Billing Years in this opinion.

vember 2010, CPS Energy filed suit against AT&T in Bexar County, and that proceeding was abated in February 2012.

**The Commission proceeding**

In its petition and request for enforcement filed with the Commission, CPS Energy sought an order requiring AT&T and TWC to pay all outstanding pole-attachment fees and determining that CPS Energy's method for calculating pole-attachment fees was reasonable and consistent with PURA Section 54.204. AT&T and TWC subsequently filed motions to dismiss CPS Energy's petition, asserting that CPS Energy lacked standing to file the petition and that the Commission lacked jurisdiction over the contractual issues and had no authority to award damages. The Commission ruled that it had jurisdiction to determine whether CPS Energy's pole-attachment rates comply with PURA and that CPS Energy had standing to seek a declaratory order regarding the issue of whether its pole-attachment rates comply with PURA Section 54.204. However, the Commission dismissed for want of jurisdiction CPS Energy's claims seeking payment of overdue pole-attachment fees. The Commission found that the appropriate venue for these claims was a court with subject-matter jurisdiction over contract damages.

The Commission subsequently referred the remaining issues to the State Office of Administrative Hearings for hearing before administrative law judges (ALJs). After extensive proceedings, the ALJs issued a proposal for decision (PFD). The PFD contained the ALJs' findings of fact and conclusions of law setting forth their calculation of CPS Energy's maximum-allowable rate for the years at issue and concluding that CPS Energy had not violated Section 54.204's nondiscrimination provisions, except that it discriminated against TWC from September 1, 2006 through December 31, 2006, in violation of Section 54.204(c). After further proceedings, the Commission issued its final Order on Rehearing (Final Order), in which it accepted some but rejected others of the ALJs' findings and conclusions. *See* Tex. Gov't Code § 2003.049(g) (outlining when Commission may change ALJ's findings and conclusions).

As noted earlier, this case took nearly four years to complete at the Commission level, involving over 800 filings, close to 60 orders, and several certified questions to the Commission before the PFD was issued. The main issues addressed in the Commission proceedings were whether CPS Energy (1) violated PURA Section 54.204 by having discriminatory rates or terms in its pole-attachment agreements with TWC as compared to AT&T, (2) charged uniform rates to all non-affiliated entities that attached to its poles, and (3) complied with PURA Section 54.204(c)'s requirement that its pole-attachment rates cannot exceed the maximum-allowable rate determined from the FCC's Telecom Formula. To determine whether CPS Energy's rates complied with the rate cap in Section 54.204(c), the Commission concluded that it had jurisdiction to review and modify the appropriate inputs, including defaults and rebuttable presumptions, used to calculate the rate under the Telecom Formula. In addition, because the FCC amended the Telecom Formula in 2011 during the pendency of the proceeding, the Commission also considered the applicability of the FCC amendments and the methodology for calculating pole-attachment rates on a going-forward basis.

The Commission reiterated in its Final Order that it did not decide whether any existing pole-attachment agreements are contractually valid or enforceable, whether CPS Energy is owed any allegedly overdue pole-attachment fees, or whether any rates charged by CPS Energy are reasonable. The Commission did not determine the rate that CPS Energy should charge for pole attachments. The Commission limited its determination to the maximum rate that CPS Energy may charge for pole attachments.[5]

The Commission found the following maximum-allowable rates for Billing Years 2005 through 2009 (the highest rate that CPS Energy charged for each year is also shown):

| Test Year | Billing Year | Maximum Allowable Rate | CPS Invoiced Rate |
|---|---|---|---|
| 2004 | 2005 | $14.92 | $13.52 |
| 2005 | 2006 | $18.10 | $15.63 |
| 2006 | 2007 | $17.96 | $15.63 |
| 2007 | 2008 | $16.50 | $19.82 |
| 2008 | 2009 | $16.18 | $19.82 |
| 2009 | 2010 | $14.68 | not in Final Order |

Accordingly, the Commission concluded that CPS Energy violated PURA Section 54.204(c) by charging AT&T and TWC a rate above the maximum-allowable rate for Billing Years 2008 and 2009. The Commission further stated in its Final Order that "[i]f CPS Energy charged above $14.68 in test/billing year 2009/2010, CPS Energy charged above the maximum allowable rate for that year as well." In other relevant part, the Commission determined that CPS Energy:

(1) violated Section 54.204(c)'s uniform-rate requirement by charging AT&T different pole-attachment rates for the period between September 1, 2006, and December 31, 2006, and that retroactively billing AT&T did not cure the violation because "competitive damage would have already occurred";

(2) violated Section 54.204(c)'s uniform-rate requirement by failing "to take timely action to ensure that all pole attachers actually paid the uniform rate it invoiced" because AT&T continued to pay the $3.75 rate

even after CPS Energy began invoicing a uniform rate in Billing Year 2007; and

(3) violated Section 54.204(b)'s nondiscrimination provision by offering different terms to AT&T and TWC from September 7, 2005, to the end of 2010 and by violating the uniform-rate provision as discussed above.

The Commission also determined that "competitive harm necessarily occurred as a result of the different rates and terms offered to AT&T and TWC, as well as the different rates collected between AT&T and TWC." Finally, the Commission concluded that it does not have the authority to assess a monetary penalty for violations of Section 54.204 and that Section 54.204 does not expressly give it the power to order remedies for past violations of Section 54.204. Accordingly, it ordered CPS Energy to comply with the relevant statutory provisions going forward by charging a uniform rate and not discriminating in favor of or against a CTP in its pole-attachment agreements.[6]

5. Accordingly, we will not consider any of these issues.

6. The findings of fact (FOF), conclusions of law (COL), and ordering paragraphs (OP) in the Commission's Final Order that are challenged in this appeal are identified in the discussion of the relevant issues.

## The district court's judgment

After the parties appealed the Commission's Final Order to the district court for judicial review, the district court affirmed the Final Order in part and reversed in part. The district court concluded that the Commission lacked jurisdiction to make determinations about the following issues: (1) the existence of or the statute's effect on disputed private pole-attachment agreements; (2) whether there was a breach of contract; and (3) whether discrimination under PURA necessarily caused harm. The district court reversed the Commission's findings of fact and conclusions of law concerning these issues, stating "[t]hese findings and conclusions are unnecessary to the Commission's order, and their absence does not affect the order." None of the parties challenge this portion of the district court's judgment. Therefore, we will not consider it.

The district court also reversed the Commission's decision on two of the Telecom Formula inputs. It reversed the Commission's decision to use an average of three attaching entities in its calculation of the pole-attachment rate for Billing Years 2005-2010 instead of the FCC's rebuttable presumption of five attaching entities. The district court also reversed the Commission's decision to adopt a rate of return other than the FCC's default rate of return of 11.25% for Billing Year 2005. The district court otherwise affirmed the Commission's Final Order and remanded the matter to the Commission for proceedings consistent with the district court's judgment. This appeal followed.

## The parties' issues on appeal

CPS Energy raises five issues on appeal. It challenges the district court's reversal of the Commission's decision to use an average of three attaching entities in its calculation of the pole-attachment rate for Billing Years 2005-2010 instead of the FCC's rebuttable presumption of five attaching entities. In addition, CPS Energy challenges the district court's affirmance of several Commission conclusions. CPS contends that (1) the Commission does not have the authority to review and modify CPS Energy's inputs used to calculate the maximum-allowable pole-attachment rate; (2) the FCC's 2011 amendments to its rules do not automatically apply to PURA Section 54.204(c); (3) the Commission exceeded its authority by imposing a requirement on CPS Energy to not only charge a uniform rate but also *collect* a uniform rate; and (4) Section 54.204(b)'s nondiscrimination provision does not apply to this proceeding because CPS Energy's pole-attachment agreements did not grant consent for use of a right-of-way as required for application of the provision.

Like CPS Energy, the Commission challenges the district court's reversal of the Commission's decision to use an average of three attaching entities in its calculation of the pole-attachment rate for Billing Years 2005-2010 instead of the FCC's rebuttable presumption of five attaching entities. The Commission also challenges the district court's reversal of the Commission's decision to adopt a rate of return other than the FCC default rate for Billing Year 2005.

AT&T and TWC challenge both the district court's reversal of the Commission's decision on the rate of return for Billing Year 2005 and the district court's affirmance of the Commission's determination that PURA does not give it jurisdiction to modify the FCC default rate of return for Billing Years 2006-2010.

## STANDARDS OF REVIEW

In an administrative appeal governed by the substantial-evidence rule, like this one, a court may affirm the state agency's decision in whole or in part and shall reverse or remand the case for further proceed-

ings if the appellant's substantial rights at the agency level have been prejudiced because the agency has committed one of the errors listed in Section 2001.174(2).[7] *See* Tex. Gov't Code § 2001.174 (establishing standard for review under substantial-evidence rule); Tex. Util. Code § 15.001 (providing that any party to proceeding before Commission is entitled to judicial review under substantial-evidence rule). The list of potential reversible errors includes administrative findings, inferences, conclusions, or decisions that are:

(A) in violation of a constitutional or statutory provision;

(B) in excess of the agency's statutory authority;

(C) made through unlawful procedure;

(D) affected by other error of law;

(E) not reasonably supported by substantial evidence considering the reliable and probative evidence in the record as a whole; or

(F) arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

Tex. Gov't Code § 2001.174(2)(A)-(F).

 Every state administrative agency has only those powers expressly conferred upon it by the Texas Legislature. *Public Util. Comm'n of Tex. v. City Pub. Serv. Bd. of San Antonio*, 53 S.W.3d 310, 316 (Tex. 2001) ("*CPS Board I*"). "When the Legislature expressly confers a power on an agency, it also impliedly intends that the agency have whatever powers are reasonably necessary to fulfill its express

functions or duties." *Id.* However, an agency may not exercise what is effectively a new power or a power that contradicts the statute, even if the power is expedient for administrative purposes. *Id.* Furthermore, we consider the agency's interpretation of its own powers only if that interpretation is reasonable and not inconsistent with the statute. *Id.*

 An agency acts arbitrarily and capriciously when it: (1) denies a litigant due process and prejudices its substantial rights; (2) wholly adopts the record from another case involving different parties, fails to make findings of fact, and bases its decision on its findings made in the other case; or (3) improperly bases its decision on non-statutory criteria. *Texas Health Facilities Comm'n v. Charter Med.-Dallas, Inc.*, 665 S.W.2d 446, 454 (Tex. 1984) (analyzing cases). In addition, an agency abuses its discretion or its decision is arbitrary "if the agency: (1) failed to consider a factor that the legislature directs it to consider; (2) considers an irrelevant factor; or (3) weighs only relevant factors that the legislature directs it to consider but still reaches a completely unreasonable result." *City of El Paso v. Public Util. Comm'n of Tex.*, 883 S.W.2d 179, 184 (Tex. 1994) (citing *Gerst v. Nixon*, 411 S.W.2d 350, 360 n.8 (Tex. 1966)). An agency's decision is also arbitrary if it is made without regard for the facts, relies on fact findings that are not supported by any evidence, or lacks a rational connection between the facts and the decision. *See City of Waco v. Texas Comm'n on Envtl. Quality*, 346 S.W.3d 781, 819-20 (Tex. App.—Austin

---

**7.** Whether the agency's order satisfies the substantial-evidence standard is a question of law. *Firemen's & Policemen's Civil Serv. Comm'n v. Brinkmeyer*, 662 S.W.2d 953, 956 (Tex. 1984). Consequently, the district court's judgment is not entitled to deference on appeal, *see Texas Dep't of Pub. Safety v. Alford*, 209 S.W.3d 101, 103 (Tex. 2006) (per cu-

riam), and the focus of this Court's review on appeal from the district court's judgment is on the agency decision, not the district court's judgment, *see Heritage on the San Gabriel Homeowners Ass'n v. Texas Comm'n on Envtl. Quality*, 393 S.W.3d 417, 424 (Tex. App.—Austin 2012, pet. denied).

2011) (analyzing cases), *rev'd on other grounds*, 413 S.W.3d 409 (Tex. 2013). In other words, we must remand for arbitrariness if we conclude that the agency has not " 'genuinely engaged in reasoned decision-making.' " *Id.* (quoting *Starr Cty. v. Starr Indus. Servs., Inc.*, 584 S.W.2d 352, 356 (Tex. Civ. App.—Austin 1979, writ ref'd n.r.e.)).

We review the agency's legal conclusions for errors of law and its factual findings for support by substantial evidence. *Heat Energy Advanced Tech., Inc. v. West Dallas Coal. for Envtl. Justice*, 962 S.W.2d 288, 294-95 (Tex. App.—Austin 1998, pet. denied). Our substantial-evidence review of factual findings "gives significant deference to the agency in its field of expertise." *Railroad Comm'n of Tex. v. Torch Operating Co.*, 912 S.W.2d 790, 792 (Tex. 1995). Substantial-evidence review of these findings requires "only more than a mere scintilla." *Id.* at 792-93. Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion of fact." *Lauderdale v. Texas Dep't of Agric.*, 923 S.W.2d 834, 836 (Tex. App.—Austin 1996, no writ) (quoting *Pierce v. Underwood*, 487 U.S. 552, 564-65, 108 S.Ct. 2541, 101 L.Ed.2d 490 (1988)) (internal quotation marks omitted). We consider the reliable and probative evidence in the record as a whole when testing an agency's findings, inferences, conclusions, and decisions to determine whether they are reasonably supported by substantial evidence. *See Charter Med.*, 665 S.W.2d at 452. We presume that the Commission's order is supported by substantial evidence, and the challenging parties bear the burden of proving otherwise. *See id.* at 453. The burden is a heavy one—even a showing that the evidence preponderates against the agency's decision will not be enough to overcome it, if there is some reasonable basis in the record for the action taken by the agency. *See id.* at 452. We may not substitute our judgment for the agency's judgment "on the weight of the evidence on questions committed to agency discretion." Tex. Gov't Code § 2001.174. Resolving factual conflicts and ambiguities is the agency's function, and the substantial-evidence rule protects that function. *Firemen's & Policemen's Civil Serv. Comm'n v. Brinkmeyer*, 662 S.W.2d 953, 956 (Tex. 1984). Our ultimate concern is the reasonableness of the agency's order, not its correctness. *Id.*

We review issues of statutory construction de novo. *Texas Lottery Comm'n v. First State Bank of DeQueen*, 325 S.W.3d 628, 635 (Tex. 2010). Our primary objective when construing statutes is to give effect to the Legislature's intent, which we seek first and foremost in the text of the statute. *First Am. Title Ins. Co. v. Combs*, 258 S.W.3d 627, 631-32 (Tex. 2008). The plain meaning of the text is the best expression of legislative intent, unless a different meaning is apparent from the context or application of the plain language would lead to absurd results. *Molinet v. Kimbrell*, 356 S.W.3d 407, 411 (Tex. 2011). When a statute's words are unambiguous, "it is inappropriate to resort to rules of construction or extrinsic aids to construe the language." *City of Rockwall v. Hughes*, 246 S.W.3d 621, 626 (Tex. 2008).

■ When reviewing an agency's interpretation of a statute that it is charged with enforcing, we first consider whether the statute is ambiguous. *See Railroad Comm'n of Tex. v. Texas Citizens for a Safe Future & Clean Water*, 336 S.W.3d 619, 625 (Tex. 2011) (citing *Fiess v. State Farm Lloyds*, 202 S.W.3d 744, 747 (Tex. 2006)). If the Legislature's intent is "clear and unambiguous under the language of the statute, that is the end of the inquiry."

*Id.* If the statute is ambiguous, however, we will generally uphold the agency's construction of a statute it is charged by the Legislature with enforcing, if the agency's construction is reasonable and does not contradict the statute's plain language. *Id.* "Deference is particularly warranted when the statutory term at issue is 'amorphous,' when the agency oversees 'a complex regulatory scheme,' and when the analysis to be performed 'implicates' the agency's technical expertise." *State of Tex.' Agencies & Institutions of Higher Learning v. Public Util. Comm'n of Tex.*, 450 S.W.3d 615, 625 (Tex. App.—Austin 2014, pet. granted) (quoting *Texas Citizens*, 336 S.W.3d at 629-30), *aff'd in part, rev'd in part on other grounds sub nom. Oncor Elec. Delivery Co. v. Public Util. Comm'n of Tex.*, 507 S.W.3d 706 (Tex. 2017).

## ANALYSIS

■ We first consider whether the Commission has the authority to review and modify CPS Energy's inputs used to calculate the maximum-allowable pole-attachment rate under the Telecom Formula. We then analyze the two issues related to the Telecom Formula inputs for the number of attaching entities and for the rate of return. We next consider whether the Commission exceeded its authority by imposing a requirement on CPS Energy to not only charge a uniform rate but also *collect* a uniform rate. We then determine whether Section 54.204(b)'s nondiscrimination provision applies to this proceeding. Finally, we assess whether our Court has jurisdiction to consider the Commission's conclusion that the FCC's 2011 amendments to its rules automatically apply to PURA Section 54.204(c).

## I. The Commission's authority to enforce Section 54.204(c)'s maximum-allowable-rate provision

CPS Energy appeals the district court's affirmance of the Commission's conclusion

of law 5D that it "has the jurisdiction to review and modify each input, including defaults and rebuttable presumptions, used to calculate the maximum allowable pole-attachment rates under the rules adopted by the FCC under 47 U.S.C. § 224(e)." CPS Energy asserts that the Commission has neither express nor implied authority to review or modify an MOU's inputs to the Telecom Formula. CPS Energy contends that the Commission's authority is limited to enforcing Section 54.204's requirements and that such authority is distinct from the power to set, determine, or establish rates. CPS Energy further asserts that the Commission's modifications to CPS Energy's inputs have the potential to deprive the City of San Antonio of its right to receive reasonable compensation for access to its property in violation of PURA Section 54.205 and amount to retroactive ratemaking. The Commission, AT&T, and TWC all contend otherwise.

When considering whether the Commission exceeded its authority by modifying CPS Energy's inputs to the Telecom Formula, we first consider whether the Legislature expressly gave the Commission the power to do so. *See CPS Board I*, 53 S.W.3d at 316. The plain language of Section 54.204 provides that "[n]otwithstanding any other law, the [C]ommission has the jurisdiction necessary to enforce this section." *See* Tex. Util. Code § 54.204(d). The Legislature thus expressly afforded the Commission broad authority to enforce Subsection (c), which establishes that an MOU "may not charge any entity . . . a pole attachment rate . . . that exceeds the fee [it] would be permitted to charge under rules adopted by the [FCC] under 47 U.S.C. Section 224(e) if [the MOU's] rates were regulated under federal law and the rules of the FCC." *Id.* § 54.204(c). "[W]hen

the Legislature expressly confers a power on an agency, it also impliedly intends that the agency have whatever powers are reasonably necessary to fulfill its express duties." *CPS Board I*, 53 S.W.3d at 316; *see also Texas Bldg. Owners & Managers Ass'n v. Public Util. Comm'n of Tex.*, 110 S.W.3d 524, 532 (Tex. App.—Austin 2003, pet. denied) (holding that Legislature's giving Commission "jurisdiction to enforce this section" was both grant of express authority and implied grant of powers reasonably necessary to fulfill its duties). CPS Energy argues that the power granted by the Legislature to the Commission to enforce Section 54.204 and to determine if an MOU's rates exceed those allowed under the FCC's Telecom Formula does not give the Commission "additional authority to review or modify CPS Energy's inputs to the Telecom Formula that are based on its books and records, and to thereby modify CPS Energy's maximum allowable pole attachment rate." CPS Energy contends that such modification would result in the Commission setting CPS. Energy's maximum-allowable rate and that the Commission's limited rate-setting authority over MOUs does not extend to setting pole-attachment rates.

CPS Energy's argument depends on the premise that Commission modification of CPS Energy's inputs to the Telecom Formula is the equivalent of rate setting. However, determining the ceiling for the pole-attachment rate in order to enforce the ceiling is not the same as setting the rate. Any rate charged by an MOU that is at or below the maximum-allowable rate complies with Section 54.204(c) as long as it is uniform to all attaching entities and is applied in a nondiscriminatory manner. The Commission is not requiring CPS Energy to charge the maximum-allowable rate. Instead, in this proceeding, as CPS Energy requested, the Commission examined CPS Energy's method for calculating its pole-attachment rate to determine whether the rate charged by CPS Energy exceeded the maximum-allowable rate under the requirements of PURA and the FCC Telecom Formula.

The effect of the Commission's action here in modifying inputs to determine a rate's ceiling differs from the effect of the contested Commission actions in the cases relied on by CPS Energy to support its argument that the Commission lacks express or implied power to modify the inputs. *See CPS Board I*, 53 S.W.3d at 312, 325 (determining that Commission exceeded its statutory authority when it promulgated rules establishing wholesale transmission rates for municipally owned utilities and establishing access fee); *Public Util. Comm'n of Tex. v. City Pub. Serv. Bd. of San Antonio*, 109 S.W.3d 130, 132-33 (Tex. App.—Austin 2003, no pet.) ("*CPS Board II*") (determining that Commission could not use transmission-cost-of-service (TCOS) number determined under same rules declared to be invalid rate-setting scheme in *CPS Board I* to carry out other oversight responsibilities under PURA). In *CPS Board I*, the Texas Supreme Court examined the Commission's rules promulgated under PURA Chapter 35, which required all transmission-owning utilities to provide "open access" to their transmission facilities for wholesale transmission, 53 S.W.3d at 313, and which also required the Commission to "adopt rules relating to wholesale transmission service, rates, and access," *id.* at 319. The court determined that the challenged rules, rather than establishing a pricing methodology, impermissibly set rates because no utility had a choice about whether to collect or pay the charge at issue, the elements of the charge were non-negotiable, and each utility was required to submit to a contested-case hearing to have its precise

numbers ascertained. *Id.* at 316-17. The court also concluded that PURA Chapter 36, which gives the Commission broad ratemaking power over investor-owned utilities, allowed the Commission to set rates for wholesale transmission service provided by investor-owned utilities, but not for MOUs, which retain the ability to set their own rates. *Id.* at 317-18. The court further concluded that Chapter 35 lacked the clear language of Chapter 36 and failed to give the Commission the explicit power to "establish and regulate" transmission rates for MOUs. *Id.* (quoting PURA Section 36.001(a)). The court in *CPS Board I* distinguished between the specific power to review rates for reasonableness, which Chapter 35 expressly gave the Commission over MOUs, and the power to initially set rates, which Chapter 35 did not expressly or impliedly give the Commission over MOUs. *Id.* at 319-20. The court also determined, however, that "[o]nce confronted with a dispute between utilities, the Commission can arrive at a reasonable rate to resolve that dispute." *Id.* at 320.

In this case, as explained above, we conclude that determining and enforcing a rate ceiling differs from setting an initial rate. Moreover, the Commission developed CPS Energy's maximum-allowable rate in the context of resolving a dispute under the maximum-rate provision that it is statutorily authorized to enforce. *See id.* at 320 (explaining that Chapter 35 contemplated oversight role for Commission that included arriving at reasonable rate to resolve disputes between utilities); *cf. CPS Board II*, 109 S.W.3d at 137 (concluding that Commission could not use TCOS number that was developed as part of invalid rate-setting scheme apart from Commission's role in dispute resolution because using it to check reasonableness of rates or to conduct other oversight functions would bear "too close a nexus to actual rate-setting to withstand scrutiny"). While it is true that MOUs retain the ability to set their own rates, *see* Tex. Util. Code § 32.002, and that the Commission may establish rates for MOUs only in limited circumstances, *see id.* §§ 33.002(a)-(b), .051, .052, .054, we conclude that the Commission's modification of CPS Energy's inputs to the Telecom Formula does not exceed the scope of the Commission's jurisdiction over MOUs.

PURA Subsections 54.204(c) and (d) explicitly require the Commission's enforcement of the maximum-allowable rate to be directed by the FCC rules adopted under 47 U.S.C. Section 224(e) as if the MOU's rates were regulated under federal law and the FCC rules. In other words, the Commission must refer to federal law and FCC rules when determining the maximum-allowable rate. Federal law required the FCC to prescribe regulations in the late 1990s "to govern the charges for pole attachments used by telecommunications carriers to provide telecommunications services, when the parties fail to resolve a dispute over such charges. Such regulations shall ensure that a utility charges just, reasonable, and nondiscriminatory rates for pole attachments." 47 U.S.C. § 224(e). The FCC regulations provide that when the FCC is considering a complaint alleging that a rate, term, or condition for a pole attachment is not just and reasonable, and "costs, values or amounts are disputed, *the [FCC] may estimate such costs, values or amounts it considers reasonable.*" 47 C.F.R. § 1.1409(a) (emphasis added). Furthermore, "[t]he [FCC] shall determine whether the rate, term or condition complained of is just and reasonable." *Id.* § 1.1409(c). The FCC applies the Telecom Formula to determine "a maximum just and reasonable rate." *Id.* § 1.1409(e). By giving the Commission "the jurisdiction necessary to enforce this section" and requiring the Commission's enforcement to

be directed by federal law and FCC rules, the Legislature expressly contemplated that the Commission would act with the same authority as the FCC when determining the maximum-allowable rate. To do so, the Commission must be able to assess whether CPS Energy is properly allocating costs, and if necessary, must be able to modify CPS Energy's inputs when determining what the maximum-allowable rate is. Consequently, we conclude that the Commission, like the FCC, may "estimate such costs, values or amounts it considers reasonable" when applying the Telecom Formula to determine the "maximum just and reasonable rate" that an MOU may charge, as long as it does so with reference to the FCC's rules and regulations and its orders applying the Telecom Formula.

CPS Energy also complains of two hypothetical outcomes if the Commission has the authority to modify the inputs to the Telecom Formula: deprivation of the City's historical rights and retroactive ratemaking. CPS Energy contends that "[i]f using the Commission's inputs in lieu of CPS Energy's actual data results in maximum allowable rates below CPS Energy's costs, the City of San Antonio will be deprived of its historical right to receive reasonable compensation for access to its property in violation of PURA § 54.205." *See* Tex. Util. Code § 54.205 (providing that PURA "does not restrict a municipality's histori-

cal right to control and receive reasonable compensation for access to the municipality's public streets, alleys, or rights-of-way or to other public property"). CPS Energy does not assert, however, that the Commission's modification of inputs in this case has resulted in maximum-allowable rates below CPS Energy's costs and that it has thus been denied reasonable compensation; consequently, we need not address this argument. *See Texas Ass'n of Bus. v. Texas Air Control Bd.*, 852 S.W.2d 440, 444 (Tex. 1993) (courts prohibited from issuing advisory opinions that decide abstract question of law without binding parties). Similarly, CPS Energy complains that Commission modification of CPS Energy's inputs to the Telecom Formula might lead to retroactive ratemaking. As previously explained, the Commission's determination of the maximum-allowable rate under Section 54.204 is not ratemaking, and therefore, the Commission's determination that CPS Energy's past rates exceeded the maximum-allowable rate does not constitute retroactive ratemaking.[8] Having concluded that the Commission has express authority to review or modify an MOU's inputs to the Telecom Formula to enforce Section 54.204's maximum-allowable-rate provision, we overrule CPS Energy's challenge to the Commission's authority, which is its third issue presented on appeal. We affirm the portion of the district court's judgment affirming the Commission's con-

8. CPS Energy also asserts that the Commission cannot retroactively revise an MOU's costs as derived from its books and records, although it acknowledges that the Commission has authority to correct an input or default rate when it does not comply with the federal laws and rules. It is not clear from the briefing or the record what costs CPS Energy asserts that the Commission revised on a basis other than noncompliance with the federal laws and rules. To the extent CPS Energy argues that the Commission cannot determine whether CPS Energy's identified costs are reasonable because the Commission does not have authority to determine whether CPS Energy's rates are reasonable, we disagree. Although the Commission stated in its Final Order that it was only determining the maximum rate and was not "determining whether any rates charged by CPS Energy are reasonable," as discussed above, the Commission, like the FCC, may estimate such costs, values, or amounts it considers reasonable and may determine whether any rate, term, or condition is "just and reasonable" in the context of determining the maximum-allowable rate. *See* 47 C.F.R. § 1.1409(a), (c).

clusion that it has jurisdiction to review and modify CPS Energy's inputs to the Telecom Formula.

## II. Telecom Formula input: average number of attaching entities

The parties raise issues concerning two inputs into the Telecom Formula incorporated into Section 54.204. The first of those input issues relates to the average number of attaching entities. The Telecom Formula calculates a utility's historical cost of owning and maintaining poles and then allocates a portion of that cost to each attaching entity based on the amount of space the entity occupies on the pole. The average number of attaching entities is an input into the Telecom Formula related to the space-allocation factor. In their first issues presented on appeal, CPS Energy and the Commission both assert that the district court erred by reversing the Commission's finding of fact 50 that CPS Energy had an average of three attaching entities for Billing Years 2005-2010.

Some background information related to the FCC's rule on attaching entities will aid in analyzing this issue. For purposes of the Telecom Formula, utilities have "to apportion the cost of providing unusable space on a pole so that such apportionment equals two-thirds of the costs of providing unusable space that would be allocated to such entity under an equal apportionment of such costs among all attaching entities."[9] 47 C.F.R. § 1.1417(a). In other words, the formula allocates the costs related to unusable space on an average pole between the pole owner and the attaching entities. Accordingly, "[a]ll attaching entities attached to the pole shall be counted for purposes of apportioning the cost of unusable space." *Id.* § 1.1417(b). This count of entities includes the pole owner and any other entity with a physical attachment to the pole, including government-entity attachers, whether or not they pay for the right to attach. *In re Implementation of Section 703(e) of the Telecomms. Act of 1996*, CS Docket No. 97-151, FCC 01-170, 16 FCC Rcd. 12103, 12133 ¶¶ 58-59 (2001) (*"Reconsideration Order"*); *see also* 47 C.F.R. § 1.1417(b).

The FCC's rule on attaching entities provides two rebuttable presumptive averages that utilities may use when calculating the number of attaching entities. 47 C.F.R. § 1.1417(c). The Commission has explained that it provided these presumptions "to expedite the process of developing average numbers of attaching entities, and [to] allow utilities to avert the expense of developing location specific averages." *Teleport Commc'ns Atlanta, Inc. v. Georgia Power Co.*, File No. PA00-005, FCC 02-270, 17 FCC Rcd. 19859, 19866 ¶ 18 (2002). "This gives both small and large utilities the option of not conducting a potentially costly and burdensome exercise necessary to develop averages based on their company specific records." *Reconsideration Order*, 16 FCC Rcd. at 12139 ¶ 69. The presumptive average number for urbanized areas (population greater than 50,-000) is five, and the presumptive average

9. The "unusable space" means the "space on a utility pole below the usable space, including the amount required to set the depth of the pole." *Id.* § 1.1402(*l*); *see also In re Amendment of Rules & Policies Governing Pole Attachments*, CS Docket No. 97-98, FCC 00-116, 15 FCC Rcd. 6453, 6523 (2000) (*"Fee Order"*) (revising 47 C.F.R. § 1.1402(*l*)). "Total usable space" is "the space on a utility pole above the minimum grade level [the above-ground clearance from the ground to the lowest attachment on the pole] which can be used for the attachment of wires, cables, and associated equipment, and which includes space occupied by the utility." 47 C.F.R. § 1.1402(c); *see also In re Implementation of Section 703(e) of the Telecomms. Act of 1996*, CS Docket No. 97-151, FCC 01-170, 16 FCC Rcd. 12103, 12129 ¶ 48 (2001) (*"Reconsideration Order"*).

number for non-urbanized areas (population less than 50,000) is three. *Id.* at 12139-40 ¶¶ 71-72. The City of San Antonio is an urbanized area as contemplated by the rule. *See id.* at 12140 ¶ 72.

The FCC also allows either the utility or the attachers to "rebut this presumption with a statistically valid survey or actual data." *Id.* at 12139 ¶ 70. The FCC's rule provides that "a utility may establish its own presumptive average number of attaching entities...." 47 C.F.R. § 1.1417(d). The rule sets forth the process for doing so:

(1) Each utility shall, upon request, provide all attaching entities and all entities seeking access the methodology and information upon which the utility's presumptive average number of attachers is based.

(2) Each utility is required to exercise good faith in establishing and updating its presumptive average number of attachers.

(3) The presumptive average number of attachers may be challenged by an attaching entity by submitting information demonstrating why the utility's presumptive average is incorrect. The attaching entity should also submit what it believes should be the presumptive average and the methodology used. Where a complete inspection is impractical, a statistically sound survey may be submitted.

(4) Upon successful challenge of the existing presumptive average number of attachers, the resulting data determined shall be used by the utility as the presumptive number of attachers within the rate formula.

*Id.*

CPS Energy and the Commission assert that substantial evidence supports the Commission's finding because both CPS Energy's actual data and its 2010 valid statistical survey showed that three was the correct average number of attaching entities to use in determining the maximum pole-attachment rate. The Commission and CPS Energy assert that: CPS Energy provided a good-faith estimation, based on its data and on a statistically valid survey; its average number of pole attachments was three, not five; and the Commission concluded that CPS Energy demonstrated by a preponderance of the evidence that the average number was three. CPS Energy and the Commission contend that AT&T and TWC failed to meet their burden to challenge CPS Energy's presumptive average by providing information to demonstrate why the average of three was incorrect and by submitting the methodology to support the average of five that AT&T and TWC suggested was correct. *See id.* § 1.1417(d)(3).

AT&T and TWC, on the other hand, argue that CPS Energy failed to rebut the FCC's presumption with data from its billing records. They contend that the Commission rejected the testimony that CPS Energy and the Commission cite on appeal and that the Commission concluded in findings of fact 49A and 49B that CPS Energy did not have the data to rebut the FCC's presumptions for Billing Years 2005-2010. AT&T and TWC contend that instead of relying on CPS Energy's data, the Commission relied on the survey conducted by CPS Energy in 2010 to conclude that CPS Energy could use three as the average number on a going-forward basis and also applied the results of the 2010 survey on a retroactive basis to allow CPS Energy to use three as the input for Billing Years 2005-2010. AT&T and TWC contend that CPS Energy supplied no evidence to support the retroactive application of the 2010 survey and

that the district court properly reversed the Commission's unsupported and unlawful use of the survey. *See* Tex. Gov't Code § 2001.174(2)(D) (allowing reversal of agency decision if "affected by other error of law"), (E) (allowing reversal when decision is "not reasonably supported by substantial evidence"). Consequently, according to AT&T and TWC, CPS Energy never established its own presumptive average of three, and the Commission improperly shifted the burden of proof to them to rebut that average. AT&T and TWC contend that the district court consequently had a sufficient legal basis for reversing the Commission's finding because the Commission violated FCC rules by failing to properly apply the FCC's rebuttable presumption and the burden of proof.

### A. CPS Energy's actual data

To determine whether the district court erred by reversing the Commission's ultimate finding that "CPS Energy's poles have an average of three attaching entities per pole," we first consider the evidence supporting the Commission's underlying finding that "CPS Energy's . . . own data show an average of three attaching entities per pole." The Commission's underlying finding that CPS Energy's actual data showed an average of three attaching entities per pole is supported by testimony in the record from CPS Energy's witness, Ricardo Lopez. Lopez explained that CPS Energy calculated its average number of attachers by dividing the total number of invoiced pole attachments by the total number of poles it owns. The resulting number was an average of 1.14 attachments per pole, and including CPS Energy as an attachment on each pole resulted in

a total average of 2.14, which CPS Energy rounded up to three "to be conservative."

This initial calculation had two issues that are related.[10] First, in finding of fact 49A, the Commission found that "CPS Energy improperly included all poles in the denominator, even if they did not know whether or not they had any attachers," instead of using the smaller number of joint-use poles. Second, in finding of fact 49B, the Commission found that "CPS Energy does not have records indicating the quantity of poles in its system with non-CPS Energy attachments." As a preliminary matter, we note that the FCC rule allows a utility to establish a "good faith" average—the rule does not require 100% accuracy because the FCC recognizes the difficulty involved and expense involved in getting an accurate pole count. *See* 47 C.F.R. § 1.1417(d)(2). The FCC has also emphasized its "preference that each utility use the data it has available in its corporate and regulatory records, and not go to extraordinary lengths to be precise when reasonable estimates will generally provide an equitable process." *Reconsideration Order*, 16 FCC Rcd. at 12138 ¶ 67. Under the FCC's process, it is not fatal to CPS Energy's calculation that it does not have records indicating the exact quantity of poles in its system with non-CPS Energy attachments, if CPS Energy is able to make a reasonable estimate based on its data.

When AT&T and TWC challenged CPS Energy's initial calculation using its total number of poles, Lopez submitted additional testimony adjusting the methodology of his calculation. *See id.* at 12135 ¶ 63 (concluding that if attachers challenge average number set by utility, "the utility will be afforded the opportunity to justify

---

10. The Commission's two findings of fact concerning these issues are sub-findings 49A and 49B under finding of fact 49, which states

"CPS Energy's valid statistical survey and its own data show an average of three attaching entities per pole."

its averages. . . ."). To address the two issues, which he acknowledged in his testimony, Lopez's adjusted calculation used CPS Energy's actual data to create a "worst-case, hypothetical and unrealistic scenario" to determine the greatest possible average of attaching entities. To get the greatest possible average, he made the assumption that all attaching entities are located on the smallest possible number of poles (which is the denominator in the calculation—the smaller. the denominator, the greater the total average).

To get the smallest possible number of poles to use as the denominator, Lopez began his calculation with the number of CPS Energy-owned poles that are jointly used by CPS Energy and AT&T because AT&T has more attachments to CPS Energy poles than any other attacher. This number is the smallest possible joint-use pole number because it assumes that non-AT&T attachers only attach to a CPS Energy pole if AT&T is also on the pole. Lopez testified that there are many CPS Energy poles where the only attached entity is not AT&T and many CPS Energy poles where there are multiple attachments but AT&T is not one of the attachers. Using CPS Energy's actual data, Lopez then divided all billed attachments, plus all known City of San Antonio attachments (which he had erroneously not included in his initial calculation), by this smallest possible joint-use pole number.

Lopez also testified that the billing records were a reliable source for obtaining the number of billed attachments for all years. TWC's own witness, Robert Shugarman, referred to CPS Energy's billing data as "precise data" because of the permitting process that TWC and all other attachers, except AT&T, were required to follow. Lopez further testified that the current calculated number of AT&T attachments used for billing purposes was rea-

sonably accurate. That number was based on a statistical sampling in 2000, plus the number of new attachments since 2000. For the number of billed attachments, Lopez testified that:

> CPS Energy uses the actual data of the total number of attachments made by each entity, and as reported by each entity, as the basis for the calculation of the average number of attachers. CPS Energy updates the data annually and communicates the data to each attaching entity via its annual pole attachment invoice. No attaching entity has disputed or challenged these counts as being inaccurate nor has any attaching entity disputed its invoices on the basis of the number of attachments being billed.

The result of Lopez's calculation was an average of 3.12 attaching entities per pole. The testimony and documents in the voluminous record demonstrate "more than a scintilla" of evidence supporting the Commission's finding that CPS Energy's actual data demonstrates an average of three attachments per pole.

Neither AT&T nor TWC rebutted Lopez's final calculation. On appeal, they complain that CPS Energy did not have the records it needed to calculate the total number of poles. However, the total number of poles is irrelevant to Lopez's calculation of the average number of attachers, as the Commission ultimately found when it concluded that CPS Energy's actual data supports using three as the average. To get to the highest possible average, the smallest possible number of joint-use poles is the appropriate number to use, and AT&T and TWC have not challenged those pole counts on appeal. Furthermore, the Commission found that it was reasonable to interpolate the pole-count figures to arrive at a reasonable pole count for the years 2007 through 2009 to adjust for CPS Energy's varying pole counts for those

years, and it also found that the pole counts as testified to by CPS Energy's witness for Billing Years 2005-2010 are reasonable for the purpose of calculating the maximum-allowable pole-attachment rate.

AT&T and TWC also complain that Lopez's corrected calculation was too hypothetical and could not provide the actual data that the Commission found CPS Energy lacked (i.e., the quantity of poles in its system with non-CPS Energy attachments). We disagree. Lopez's calculation includes certain assumptions about the smallest possible number of joint-use poles, but those assumptions are based on CPS Energy's actual data. And as noted above, the FCC does not require a utility "to go to extraordinary lengths to be precise when reasonable estimates will generally provide an equitable process."

In addition, AT&T and TWC argue that the Commission's failure to mention Lopez's corrected calculation in its Final Order means that the corrected calculation cannot be the basis for the Commission's ultimate finding that "CPS Energy's poles have an average of three attaching entities per pole." AT&T argues that because the Commission omitted any mention of the corrected calculation but made findings about the flaws in the initial calculation, its decision is arbitrary and capricious, as there is no rational connection between the facts found concerning the flaw and the Commission's ultimate finding. TWC argues that the Commission's failure to mention the corrected calculation must mean that it did not put any weight on it or otherwise sanction it.

■ A substantial-evidence review requires two inquiries: (1) whether the agency made findings of underlying fact in its order that logically support the findings of ultimate fact and conclusions of law that are the basis for the agency's decision or action; and (2) if so, whether the agency's "findings, inferences, and conclusions" are reasonably supported by the evidence. See *Charter Med.*, 665 S.W.2d at 453. In essence, AT&T and TWC argue that the Commission's underlying findings about the flaw in Lopez's initial calculation destroy the logical connection between the underlying finding that CPS Energy's "own data show[s] an average of three attaching entities per pole" and the ultimate finding that "CPS Energy's poles have an average of three attaching entities per pole." We disagree. By acknowledging the flaw in the initial calculation, the Commission disclaimed its reliance on that calculation. That alone does not destroy the logical connection between the finding that CPS Energy's data showed an average of three and the finding that the average was three. We agree with the Commission that the two findings of fact related to CPS Energy's initial calculation are not a categorical rejection of all of CPS Energy's data. While the Commission did not accept the original data presented by CPS Energy as supporting the proposed average of three, CPS Energy provided evidence that corrected its initial calculation and showed that the prior error from using CPS Energy's total number of poles was immaterial because the corrected average was still three. Although CPS Energy does not have records indicating the exact quantity of poles in its system with non-CPS Energy attachments, Lopez was able to calculate the smallest possible number of such poles to produce the largest possible average by using CPS Energy's actual data. We conclude that the Commission's underlying finding that CPS Energy's data showed an average of three supports its ultimate finding that the average was three and that there is "more than a mere scintilla" of evidence to support the Commission's ultimate finding that the average

was three.[11] *See id.* at 452-53. While "an order may be supported by substantial evidence and yet be invalid for arbitrariness," this is not a situation where the agency has failed to consider all relevant factors or to "genuinely engage[ ] in reasoned decision-making." *Starr Cty.*, 584 S.W.2d at 355-56.

## B. CPS Energy's statistical survey

We next consider whether the Commission's underlying finding that CPS Energy's "valid statistical survey ... show[s] an average of three attaching entities per pole" is supported by substantial evidence and whether that finding supports the Commission's ultimate finding that "CPS Energy's poles have an average of three attaching entities per pole" and its conclusion that "[t]he inputs set out in the findings of fact are reasonable for use in the maximum rate formula for test years 2004 through 2009 (billing years 2005 through 2010)," so that we may determine whether the district court erred by reversing the Commission's decision. CPS Energy engaged an independent consulting firm "to conduct a statistically valid analysis of a survey of distribution utility poles to address the average number of entities that attach to CPS Energy's poles," according to CPS Energy's rebuttal witness, Clark Guo, the chief operating officer of the consulting firm. Guo testified that the task undertaken was "as simple as taking a count of the total number of attachers divided by the number of poles" on a sample set of CPS Energy's poles that was representative of the universe of CPS Energy's poles. The statistical survey resulted in an average of 2.744 with the 95% confidence interval being between 2.714 and 2.775. CPS Energy again rounded up to three attaching entities.

On appeal, neither AT&T nor TWC challenges the information upon which the survey was based, the methodology used, or the results. In other words, they do not assert that the Commission's underlying finding that "CPS Energy's valid statistical survey ... showed an average of three attaching entities per pole" is not supported by substantial evidence. Instead, they challenge what they characterize as the Commission's retroactive application of the 2010 survey results to Billing Years 2005-2010, and thus, they effectively challenge whether substantial evidence supports the Commission's conclusion that "[t]he inputs set out in the findings of fact are reasonable for use in the maximum rate formula for test years 2004 through 2009 (billing years 2005 through 2010)." AT&T and TWC assert that retroactively applying the survey violates the FCC's rules and precedent by failing to properly apply the FCC's rebuttable presumption and the burden of proof, an argument we will address in detail in the subsequent

11. AT&T asserts that no evidence in the record supports the Commission's determination to use three as the average number of attaching entities for Billing Years 2005-2006, and therefore, the district court correctly reversed the Commission's decision. AT&T further contends that because CPS Energy itself used five attaching entities for Billing Years 2005-2006, CPS Energy could not justify its reduction to three attaching entities a year later. We note, however, that there is evidence in the record of the billed attachments for Billing Years 2005-2009. The number of billed attachments increased slightly between 2005, 2006, and 2007 and remained very similar for 2007, 2008, and 2009, meaning that using Lopez's calculation, the average for those later years would be higher than the average for Billing Years 2005-2006. Consequently, the revised calculation based on CPS Energy's actual data (and corroborated by CPS Energy's statistical survey, as discussed below) suffices to support the Commission's ultimate finding that three was the average number of attachments on CPS Energy's poles for Billing Years 2005 through 2010. No evidence in the record rebuts this evidence and supports an average of five.

section. They further assert that the Commission made no findings and that there is no evidence in the record to show that the 2010 survey data is appropriate to use for prior years and that application of the survey before 2010 violates the Commission's own holding that the maximum-allowable rate for each year must be based on data specific to that year.

The Commission asserts that because CPS Energy provided the survey as a secondary methodology to verify its calculations of the average from actual data, the Commission only used the survey to corroborate the actual-data calculation and did not apply the survey on a retroactive basis. Because we have already concluded that substantial. evidence supports the Commission's underlying finding that CPS Energy's actual data shows an average of three attaching entities per pole, and that finding supports the Commission's ultimate finding that CPS Energy's poles have an average of three attaching entities per pole and the ultimate finding that the input of three is reasonable, the survey results merely provide additional support for those ultimate findings but are not required for those ultimate findings to be affirmed. Accordingly, we need not determine whether it would be appropriate to apply the survey results retroactively to Billing Years 2005-2010.

### C. Burden of proof under FCC rules

AT&T and TWC argue throughout their briefing on the issue of the average number of attaching entities that the Commission misapplied the FCC's rebuttable presumption and · burden of proof. TWC asserts that a utility must "rebut the presumption *before* deviating from it"

and must "share with attaching entities [its] data and methodology for doing so," although there is no such requirement in the FCC's rule or precedent for prior notice that a utility intends to establish a new presumptive value. *See* 47 C.F.R. § 1.1417(d). Furthermore, the rule only requires the utility to share its methodology and information upon which its presumptive average is based "upon request." AT&T alleges that the Commission "allowed CPS Energy to *choose* its own average number of attaching entities that automatically replaced the FCC's rebuttable presumption," and then improperly placed the burden on AT&T and TWC to rebut CPS Energy's proposed average by performing either "a complete inspection of CPS Energy's poles or performing a statistically sound survey of CPS Energy's poles." [12] We disagree with this characterization of the Commission's actions. The Commission allowed CPS Energy to establish its own presumptive average number ,of attachers as required by the FCC's rule. *See id.* While AT&T and TWC may disagree that CPS Energy successfully rebutted the FCC presumption with its actual data and its statistically valid survey, once the Commission determined that CPS Energy had rebutted the FCC presumption and established its own presumptive average, then the burden shifted to the attachers to challenge the presumptive average established by CPS Energy. *See id.* § 1.1417(d)(3).

The record demonstrates that CPS Energy, contrary to AT&T and TWC's assertions, provided them with the methodology and the information upon which its presumptive average of three is based. *See id.*

---

**12.** Although AT&T also asserts that the Commission claims "that the utility's proposal for the average number of attaching entities automatically defeats the FCC's presumption and, therefore is automatically blessed as a 'presumptive average' that attachers have the burden of ·rebutting," the Commission made no finding to that effect and does not argue on appeal that the FCC rule operates in that way.

§ 1.1417(d)(1). The testimony in the record explains how CPS Energy calculated its presumptive average using actual data and the methodology used to conduct the 2010 survey. In addition, the attaching entities were given access to all the data, photographs, inspections sheets, and maps related to the survey. AT&T and TWC had an opportunity to submit "information demonstrating why the utility's presumptive average is incorrect" and to submit "what [they] believe[ ] should be the presumptive average and the methodology used." *Id.* § 1.1417(d)(3). Although AT&T states that it submitted that the FCC presumptive average of five should apply, the record does not demonstrate that it or TWC submitted an alternative methodology that they assert should have been used to calculate an average of five, as required by the FCC rule. Furthermore, they neither performed a complete inspection of CPS Energy's poles nor submitted their own statistically sound survey, and consequently, they did not meet their burden under the rule to rebut CPS Energy's presumptive average of three after it was established in this proceeding.[13]

Having determined that (1) substantial evidence supports the Commission's underlying finding that CPS Energy's actual data and its valid statistical survey show an average of three attaching entities per pole, (2) the underlying finding supports the Commission's ultimate finding that CPS Energy's poles have an average of three attaching entities per pole, and (3) substantial evidence supports the Commission's ultimate conclusion that "[t]he inputs set out in the findings of fact are reasonable for use in the maximum rate formula for test years 2004 through 2009 (billing years 2005 through 2010)" (as it relates to the number of attaching entities), we sustain CPS Energy's and the Commission's issues concerning this input to the Telecom Formula. The Commission correctly determined that CPS Energy's average number of attaching entities for Billing Years 2005-2010 was three. The district court erred by reversing that determination, and therefore, we reverse that portion of the district court's judgment. ·

### III. Telecom Formula input: the default rate of return

 Next, we turn to the second of the two issues concerning an input into the Telecom Formula incorporated into PURA Section 54.204—the rate of return. As explained above, the Telecom Formula calculates a utility's historical cost of owning and maintaining poles and then allocates a portion of that cost to each attaching entity based on the amount of space it occupies on the pole. To arrive at the maximum-allowable rate under the Telecom Formula, the net cost of a bare utility pole is multiplied by a space-allocation factor and by a carrying-charge factor designed to determine the utility's annual cost of owning and maintaining that pole regardless of the presence of pole attachments. The carrying-charge factor includes five elements of pole cost: (1) administrative, (2) maintenance, (3) depreciation, (4) taxes, and (5) cost of capital, also known as rate of return. *In re Amendment of Rules & Policies Governing Pole Attachments*, CS

---

**13.** The parties propound opposing interpretations of the FCC rule. *See* 47 C.F.R. § 1.1417(d)(3). The Commission and CPS Energy insist that to rebut CPS Energy's presumptive average of three, AT&T and TWC were required to submit a statistically sound survey if a complete inspection of the poles was impractical. AT&T and TWC, on the other hand, urge that because the rule states that "[w]here a complete inspection is impractical, a statistically sound survey *may* be submitted," they were not required to submit a survey to rebut CPS Energy's presumptive average of three. *Id.* (emphasis added). We need not decide whether a survey or inspection are the only ways to rebut a utility's established presumptive average because in this case the attaching entities did not submit any methodology whatsoever in support of their proposed average of five. *See id.* ("The attaching entity should also submit what it believes should be the presumptive average and the methodology used.").

Docket No. 97-98, FCC 00-116, 15 FCC Rcd. 6453, 6477 ¶ 44 (2000) ("*Fee Order*"). The five elements are defined as a percentage and added together to arrive at the total carrying-charge rate. *See id.* The rate of return, the input at issue, allows the pole owner to recover its costs of debt and equity.

As mentioned previously, the federal law and FCC rules related to pole-attachment rates apply to investor-owned utilities, not to MOUs. For an investor-owned utility, the rate of return is often, but not always, set as part of the ratemaking process conducted by a state regulatory body. Accordingly, the FCC rules provide that the rate of return to be used in the Telecom Formula is "[t]he rate of return authorized for the utility for intrastate service," when available. *See* 47 C.F.R. § 1.1404(g)(1)(x); *see also Fee Order*, 15 FCC Rcd. at 6491 ¶ 76. The rules further provide that "[i]n the absence of a state authorized rate of return, the rate of return set by the Commission for local exchange carriers shall be used as a default rate of return." 47 C.F.R. § 1.1404(g)(1)(x); *see also Fee Order*, 15 FCC Rcd. at 6491 ¶ 76. For the time period at issue in this case, the default rate of

return set by the FCC was 11.25%. *In re Represcribing the Authorized Rate of Return for Interstate Servs. of Local Exch. Carriers*, CC Docket No. 89-624, FCC 90-315, 5 FCC Rcd. 7507, 7507 ¶ 1, 7533 ¶ 231 (1990) ("*ROR Order for LECs*"); *see also Fee Order*, 15 FCC Rcd. at 6491 ¶ 76 & n.253.

In its Final Order, the Commission made the following relevant findings of fact and conclusions of law:

FOF 76 Cost of capital/rate of return is an important input to the carrying charge rate of the maximum rate formula as it accounts for a significant portion of the maximum allowable pole-attachment rate in this case.

FOF 77 CPS Energy operates under the cash-flow methodology.

FOF 78 CPS Energy does not have a state-authorized rate of return.

FOF 79 For the return component, CPS Energy used the FCC's default rate of return (11.25%) since test year 2005 (billing year 2006).

FOF 80 The following rates of returns for CPS Energy in test years 2004 through 2009 (billing years 2005 through 2010) are reasonable:

Annual Rates of Return

| 2004 | 2005 | 7.641% |
|------|------|--------|
| 2005 | 2006 | 11.25% |
| 2006 | 2007 | 11.25% |
| 2007 | 2008 | 11.25% |
| 2008 | 2009 | 11.25% |
| 2009 | 2010 | 11.25% |

COL 5D The Commission has the jurisdiction to review and modify each input, including defaults and rebuttable presumptions, used to calculate the maximum allowable pole-attachment rate under the rules adopted by the FCC under 47 U.S.C. § 224(e).

COL 23 The FCC default values applicable to the Maximum rate formula are not rebuttable and must be used, if applicable.

COL 24 The inputs set out in the findings of fact are reasonable for use in the Maximum rate formula for test years 2004 through 2009 (billing years 2005 through 2010).

OP 2 CPS Energy does not need to impute or calculate a rate of return for purposes of complying with PURA § 54.204.

The district court ordered that "[t]he Commission's decision adopting a rate of return other than the [FCC's] default rate of return of 11.25% for test year 2004/bill year 2005 is reversed." The district court otherwise affirmed the portion of the Commission's Final Order concerning its rate-of-return determination.

AT&T and TWC appeal from both the district court's ruling reversing the Commission's decision to adopt 7.641% as the rate of return for Billing Year 2005 and the district court's ruling affirming the Commission's decision to apply the FCC's default rate of return of 11.25% for Billing Years 2006-2010. They assert that the district court erred by concluding that the Commission did not have jurisdiction to set a rate-of-return input other than the FCC's default rate for CPS Energy to use in the Telecom Formula. The Commission appeals only the district court's ruling reversing its decision to adopt 7.641% as the rate of return for Billing Year 2005. It argues that it acted within its statutory authority by applying the FCC's default

rate of return to CPS Energy for Billing Years 2006-2010 and by accepting the uncontested 7.641% rate of return that CPS Energy proposed for Billing Year 2005. In response, CPS Energy contends that PURA Section 54.204 requires the Commission to use the FCC's default rate of return for the years at issue, including Billing Year 2005.

This issue is one of statutory construction. We first consider the plain language of the relevant statutes. *See First Am. Title Ins. Co.*, 258 S.W.3d at 631-32. PURA Subsections 54.204(c) and (d) establish that the Commission has the jurisdiction necessary to enforce the Legislature's requirement that an MOU may only charge a pole-attachment rate that does not exceed "the fee the [MOU] would be permitted to charge under rules adopted by the [FCC] under 47 U.S.C. Section 224(e) if the [MOU's] rates were regulated under federal law and the rules of the [FCC]." Tex. Util. Code § 54.204(c), (d). As stated above, the applicable FCC rule provides that "[i]n the absence of a state authorized rate of return, the rate of return set by the Commission for local exchange carriers shall be used as a default rate of return," and the FCC's default rate is 11.25%. 47 C.F.R. § 1.1404(g)(1)(x); *see also Fee Order*, 15 FCC Rcd. at 6491 ¶ 76 & n.253; *ROR Order for LECs*, 5 FCC Rcd. at 7507 ¶ 1, 7533 ¶ 231.

The parties do not dispute that there is no state-authorized rate of return for MOUs. The City of San Antonio, not the Commission, sets CPS Energy's rates, and its ratemaking procedure does not utilize a rate of return. CPS Energy operates on the cash-flow methodology, which does not use a rate of return to account for the recovery of the costs of debt and equity. AT&T and TWC contend, however, that PURA Section 54.204(d) gives the Commission jurisdiction to prescribe a rate of

return for CPS Energy to use in the Telecom Formula. The Commission and CPS Energy disagree, asserting that if CPS Energy were regulated by federal law and the FCC's rules, it would be subject to the 11.25% default rate of return.

Although the FCC rule clearly and unambiguously mandates the use of the default rate of return in the absence of a state-authorized rate, the *Fee Order* further illuminates the FCC's decision to adopt a default rate of return in the absence of a state-authorized rate. In particular, AT&T and TWC contend that the application of the FCC rule conflicts with the purpose of the federal statute because the statute requires a "just and reasonable" pole-attachment rate, but the default rate may result in the application of a rate to CPS Energy that is higher than its actual cost of capital. The FCC's *Fee Order* is instructive on this point. The FCC understood that some utilities would not have a state-authorized rate of return. It noted that many states are moving away from regulating utility rates on a rate-of-return basis and have instead adopted incentive-based regulation. *Fee Order*, 15 FCC Rcd. at 6490 ¶ 74. One of the commenters on the FCC's proposed rule urged that "if the utility's actual realized rate of return is lower than the default, it would be inequitable to allow it a higher rate of return than its actual rate." *Id.* at 6491 ¶ 76. The FCC nevertheless concluded that "we believe that the use of the default rate of return is an equitable solution, in those instances when a state has not prescribed a rate of return for a utility covering the period of time in which rates were in dispute," because it "serves our policy of using default rates to expedite the *[Telecom] Formula* calculations." *Id.* Accordingly, it mandated the use of the default rate in the absence of a state-authorized rate and

made no provision for rebuttal of the default rate. *Compare* 47 C.F.R. § 1.1404(g)(1)(x) ("In the absence of a state authorized rate of return, the rate of return set by the Commission for local exchange carriers *shall* be used as a default rate of return." (emphasis added)) *with id.* § 1.1417(d) (providing process for utility to rebut presumptive average number of attaching entities on pole). Based on the plain language of the rule and the FCC's statements when adopting the default, we conclude that if CPS Energy were regulated by federal law and the FCC's rules, the FCC would apply the default rate of return as the input to be used in the Telecom Formula. *See Texas Citizens*, 336 S.W.3d at 625 (courts will uphold agency's interpretation of statute it is charged with enforcing, " 'so long as the construction is reasonable and does not contradict the plain language of the statute' " (quoting *First Am. Title Ins. Co.*, 258 S.W.3d at 632 (quoting *Tarrant Appraisal Dist. v. Moore*, 845 S.W.2d 820, 823 (Tex. 1993)))).

Despite the unambiguous language of the FCC rule, AT&T and TWC maintain that PURA Section 54.204(d)'s grant of jurisdiction to the Commission to enforce a maximum-allowable rate through application of the Telecom Formula and other FCC rules is a specific grant of authority that provides the Commission with jurisdiction to prescribe a rate of return specifically for CPS Energy to use in the Telecom Formula. They also insist that requiring use of the default value does not serve PURA Section 54.204's overarching goal of ensuring just and reasonable pole-attachment rates or the statutory-construction principle that the Legislature intended "a just and reasonable result," *see* Tex. Gov't Code § 311.021(3).[14] They fur-

14. Although PURA Section 54.204 does not

refer to ensuring a just and reasonable rate,

ther contend that to interpret PURA Section 54.204(c) to not allow the Commission to modify the 11.25% default rate of return by prescribing a substitute for rate of return for CPS Energy would produce an absurd result. Finally, they assert that the Commission's decision to use the default 11.25% rate of return is arbitrary and capricious and unsupported by substantial evidence because the Commission found that "CPS Energy bears the burden of proving, by a preponderance of the evidence, the reasonableness of each of its calculated inputs," but CPS Energy offered no evidence to support the use of the 11.25% rate of return.

### A. The Commission does not have the power to set a rate of return for CPS Energy

■. AT&T and TWC seek to expand Section 54.204(d)'s jurisdictional language, which limits the Commission's authority to enforcing the maximum-allowable rate *as the FCC would calculate it.* AT&T and TWC suggest that we should read the language in Section 54.204(d) that gives the Commission "the jurisdiction necessary to enforce" PURA Section 54.204 "notwithstanding any other law" to require the Commission to establish what is essentially a proxy for rate of return for CPS Energy when no rate of return has been set for CPS Energy in the ordinary course of its ratemaking process. They contend that we may imply that the Commission has this power because it is reasonably necessary to fulfill its express duty to enforce PURA Section 54.204. We disagree that this implied power is necessary for the Commission to fulfill its express duty to enforce PURA Section 54.204. PURA Section 54.204(c) requires the Commission to apply the FCC rules to CPS Energy as if CPS

Energy's rates were regulated by the FCC ("under federal law and the rules of the [FCC]"). Under the plain language of the FCC rules and its decision amending those rules, the FCC would not engage in creating a rate of return for CPS Energy where none exists—it would use the default in the absence of a state-authorized rate. The FCC would not require the state to establish a rate, and it specifically chose not to set up a process that involves assessment of a utility's actual realized rate of return. *See Fee Order*, 15 FCC Rcd. at 6491 ¶ 76.

### B. The FCC has determined that using the default rate results in a just and reasonable rate

AT&T and TWC also assert that using the 11.25% default rate of return contradicts PURA Section 54.204's overarching goal of ensuring just and reasonable pole-attachment rates and the statutory-construction principle that the Legislature intended "a just and reasonable result," *see* Tex. Gov't Code § 311.021(3). As previously discussed, however, the FCC considered the possibility raised in the comment process that using the default rate could have an inequitable effect, but it determined that the use of the default rate "is an equitable solution" that serves its "policy of using default rates to expedite" the Telecom Formula calculation—i.e., that using the default rate results in a just and reasonable rate. *Fee Order*, 15 FCC Rcd. at 6491 ¶ 76. Requiring the Commission to determine an appropriate substitute for the rate of return for each MOU would be contrary to the FCC's rules and stated policy.

### C. Following PURA and the FCC rules' plain language to apply a default rate does not lead to an absurd result

47 U.S.C. Section 224(e) provides that the FCC's regulations concerning pole-attachment rates "shall ensure that a utility charges

just, reasonable, and nondiscriminatory rates for pole attachments."

AT&T and TWC argue that the Legislature must have intended its grant of jurisdiction to the Commission to "enforce" PURA Section 54.204 to authorize the Commission to prescribe a rate of return for use in the Telecom Formula to avoid what they describe as the "absurd result" of applying a default rate intended for investor-owned utilities to an MOU. *See TGS–NOPEC Geophysical Co. v. Combs*, 340 S.W.3d 432, 439 (Tex. 2011) (holding that courts adopt statute's interpretation that is supported by statute's plain language if statute is unambiguous, unless such interpretation would lead to absurd results). On the contrary, when the Legislature adopts a federal statute, we presume that it knew how the statute had been implemented by the federal agency and constructed by federal courts when it adopted the statute and that it intended to adopt that construction. *See City of Garland v. Dallas Morning News*, 22 S.W.3d 351, 360 (Tex. 2000); *see also Acker v. Texas Water Comm'n*, 790 S.W.2d 299, 301 (Tex. 1990) ("A statute is presumed to have been enacted by the legislature with complete knowledge of the existing law and with reference to it."). The Legislature was aware that Section 224 governs only investor-owned utilities, not MOUs, when it enacted PURA Section 54.204. In addition, the Legislature did not make any exceptions to its directive to the Commission to follow the FCC's rules, despite its awareness that MOUs are not required to engage in the same reporting to the Federal Energy Regulatory Commission and other regulatory agencies as investor-owned utilities and that many of the Telecom Formula inputs are intended to be derived from those reports. The Legislature was also aware that MOUs may have expenses that investor-owned utilities do not (such as CPS Energy's obligation to pay the City of San Antonio 14% of its revenue each year), which consequently are not contemplated under federal law and the FCC rules.

Moreover, the Legislature was aware that Congress intended the FCC's program for pole-attachment rate determination to be "an expeditious program for determining just and reasonable pole attachment rates" and "that the program would necessitate a minimum of staff, paperwork and procedures." *In re Amendment of Rules & Policies Governing Pole Attachments*, CS Docket No. 97-98, FCC 97-94, 12 FCC Rcd. 7449, 7452 ¶ 4 (1997) ("*Rulemaking Notice*"). The FCC has explained that:

> Congress did not believe . . . that special accounting measures or studies would be necessary because most cost and expense items attributable to utility pole plant were already established and reported to various regulatory bodies. Congress also did not expect the Commission to re-examine the reasonableness of the cost methodologies that various regulatory agencies had sanctioned. It recognized that the Commission would have to "make its best estimate" of some of the less readily identifiable costs.

*Id.* Finally, we note that in the absence of either a state-authorized rate or the default rate prescribed by the FCC rule (the only two options contemplated by the rule), an MOU would not know what input to use for rate of return when calculating its maximum-allowable rate, unless and until there was a proceeding before the Commission to determine its maximum-allowable rate. Taking all of these circumstances into account, we conclude that applying the plain language of PURA Section 54.204(c) to require the Commission to follow the FCC's practice of using a default rate of return, instead of engaging in a contentious process to determine what an appropriate substitute would be for each

individual MOU whose pole-attachment rate is challenged, does not lead to an "absurd result."

**D. CPS Energy was not required to present evidence of the reasonableness of using the FCC-prescribed default input**

 AT&T and TWC also argue that CPS Energy should have presented evidence of the reasonableness of using the 11.25% default rate of return. They emphasize that the Commission found that CPS Energy bears the burden of proving by a preponderance of the evidence "the reasonableness of each its proposed inputs," and they insist that there is no evidence in the record to support the reasonableness of using 11.25% as the rate of return. Although the Commission found that "CPS Energy bears the burden of proving, by a preponderance of the evidence, the reasonableness of each of its calculated inputs," the default rate of return is not a *calculated* input. It is the input that applies in the absence of a state-authorized rate of return, as the FCC's rule unambiguously provides. In this situation, CPS Energy does not need to provide evidence to support the reasonableness of using the FCC-prescribed default, which is not a "calculated input." The FCC established the default rate to avoid the necessity of proving up a rate of return when no state-authorized rate of return has been set, and it omitted from the rule any process for rebutting the default. The Commission concluded that the FCC default values applicable to the Telecom Formula are not rebuttable and must be used, if applicable. AT&T and TWC assert, however-

er, that the default value may only be used if a company-specific value is not *available* and again urge that the Commission should have set a rate of return specific to CPS Energy based on the evidence presented during the hearing, an argument we reject for the reasons stated above.

**E. The Commission appropriately used the default rate for Billing Years 2006-2010 and should have used it for Billing Year 2005**

AT&T and TWC also insist it is inconsistent for the Commission to conclude on the one hand that it has the jurisdiction to review and modify each input to the Telecom Formula, including defaults, but on the other hand to find that its jurisdiction is not broad enough to modify the default rate. Upon examination, however, this supposed internal inconsistency disappears. While the Commission may examine, and if necessary, modify, the inputs used by a utility in the Telecom Formula, it may only do so within the confines of the FCC's rules. For example, as we will discuss below, CPS Energy used a value for the rate of return other than the 11.25% default for Billing Year 2005. The Commission should have modified that input and used the default rate of return because that was the appropriate rate to under the FCC's rules.

For all the reasons stated above, we affirm the portion of the district court's judgment affirming the Commission's decision to apply the 11.25% default rate of return as the appropriate input for Billing Years 2006-2010. We apply the same analysis to the Commission's decision to use CPS Energy's uncontested proposed rate of return of 7.641% to Billing Year 2005.[15]

---

15. We note that the maximum-allowable-rate provision went into effect on September 7, 2005. The Final Order states that "[c]onsequently, CPS Energy's pole-attachment agreements with AT&T and TWC were not subject to the provision in PURA § 54.204 until Sep-

tember 7, 2005, and CPS Energy cannot be found to have violated PURA § 54.204 for the period from January 1, 2005, to September 7, 2005." Accordingly, our references to Billing Year 2005 mean the September through De-

Although the Commission contends that it was within its statutory authority to accept the proposed rate because it was unopposed and this "is different than prescribing a rate of return for CPS Energy," we disagree.

The Commission's mandate is to ensure that MOUs charge pole-attachment rates that do not exceed "the fee the [MOU] would be permitted to charge under rules adopted by the [FCC] under 47 U.S.C. Section 224(e) if the [MOU's] rates were regulated under federal law and the rules of the [FCC]." Tex. Util. Code § 54.204(c). The FCC has established a default rate of return to be used in the absence of a state-authorized rate, and its rule does not provide a mechanism for rebutting that default rate. The Commission itself concluded that the FCC default values are not rebuttable and must be used if applicable. As discussed above, the FCC has stated that even though there may be situations in which a utility's actual realized rate of return may be lower than the default, in the absence of a state-authorized rate of return, using the default rate of return is an equitable solution that serves the FCC's policy of using default rates to expedite the Telecom Formula calculations. *Fee Order*, 15 FCC Rcd. at 6491 ¶ 76. The plain language of the rule and its order indicate that the FCC would not accept a proposed rate of return in the absence of a state-authorized rate merely because it was unopposed. As we concluded above, the FCC would apply the default rate of

return to CPS Energy because it has no state-authorized rate of return.

The Commission found that CPS Energy lacks a state-authorized rate of return and also concluded that the FCC default values applicable to the maximum-rate formula are not rebuttable and must be used, if applicable. Accordingly, the Commission acted arbitrarily and capriciously and abused its discretion by determining that the FCC's default rate of return was the appropriate input for CPS Energy to use in the Telecom Formula because it lacked a state-authorized rate of return and then failing to apply that input for Billing Year 2005. *See City of Waco*, 346 S.W.3d at 819-20 (explaining that agency acts arbitrarily or capriciously if there appears to be no rational connection between facts and decision). Consequently, we affirm the portion of the district court's judgment reversing the Commission's decision to apply a 7.641% rate for Billing Year 2005.[16] We overrule AT&T's, TWC's, and the Commission's issues related to the rate of return.

## IV. "Charge" v. "collect"

The next issue we will consider is also an issue of statutory construction. In its fourth issue on appeal, CPS Energy contends that the district court erred by affirming the Commission's conclusion that CPS Energy violated PURA Section 54.204(c)'s requirement to *charge* a uniform rate "after December 31, 2006 for all periods during which it made no serious effort to *collect* a uniform rate." (Emphasis

cember 2005 time frame at issue for that billing year.

16. The Commission also argues that CPS Energy lacks standing to challenge the Commission's use of the 7.641% rate of return in Billing Year 2005 because using that rate of return produces a maximum-allowable rate that is higher than the actual rate CPS Energy charged that year. Thus, the Commission argues, CPS Energy is not aggrieved by the

Commission's decision. We need not reach the issue of CPS Energy's standing because AT&T and TWC challenged the Commission's decision to use the default rate of return below, so the district court necessarily considered the statutory-construction issue of whether the default rate of return should always apply in the absence of a state-authorized rate.

added.) PURA Section 54.204(c) requires that:

> not later than September 1, 2006, a municipality or municipally owned utility *shall charge* a single, uniform pole attachment or underground conduit rate to all entities that are not affiliated with the municipality or municipally owned utility regardless of the services carried over the networks attached to the poles or underground conduit.

Tex. Util. Code § 54.204(c) (emphasis added).

The Commission found that CPS Energy violated the uniform-rate requirement after December 31, 2006, even though CPS Energy began invoicing AT&T in 2007 at the same rate of $15.63 that it invoiced TWC. AT&T, however, continued to pay only the $3.75 rate established in its "Joint Use Pole Contact Agreement" with CPS Energy. After TWC learned that AT&T was not paying the invoiced rate, TWC filed suit against CPS Energy in Bexar County (the suit was later abated). TWC also began paying the same $3.75 rate as AT&T. In January 2009, CPS Energy filed an enforcement complaint against both AT&T and TWC at the Commission. CPS Energy provided notice of its intent to terminate AT&T's contract in September 2009, and the termination became effective in March 2010. CPS Energy filed suit against AT&T in November 2010 in Bexar County, and that proceeding was abated in February 2012. The Commission concluded that "CPS Energy's failure to take meaningful action to resolve the disparity" between the rate paid by AT&T and the rate paid by TWC resulted in anti-competitive discrimination because TWC paid a significantly higher rate than AT&T for its pole attachments "for several years."

CPS Energy asserts that the Commission exceeded its authority by imposing a requirement that is not found in PURA, that the Commission's conclusion violated its procedural due-process rights by applying the requirement for the first time in its Final Order, and that there is no evidence in the record to support the conclusion that CPS Energy failed to take "meaningful action" to collect the amounts owed to it. The Commission responds that its decision did not add anything to the statute because its conclusion was merely an interpretation of the evidence in the case, and thus, CPS Energy's complaint is an evidentiary challenge concerning the weight to be accorded to the evidence. AT&T responds that CPS Energy's interpretation of the uniform-rate provision would render it meaningless because an MOU could circumvent it by sending invoices that billed pole attachers the same amount while entering into side agreements with some attachers to pay less or by simply not pursuing collection from those attachers. TWC asserts that the Commission's finding is consistent with the Commission's authority to enforce the uniform-rate provision. The Commission, AT&T, and TWC all contend that substantial evidence supports the Commission's conclusion that CPS Energy's efforts to collect a uniform rate were not "serious."

We begin, as always, by considering the plain language of the relevant statute. *See First Am. Title Ins. Co.*, 258 S.W.3d at 631-32. The Commission found that CPS Energy violated Section 54.204(c) by making "no serious effort to *collect* a uniform rate." (Emphasis added.) As stated above, PURA Section 54.204(c) requires that MOUs "shall *charge* a single, uniform pole attachment ... rate." (Emphasis added.) There is no express requirement to collect a uniform rate, so the Commission's contention that its decision added nothing to the statute and was only an interpretation of the evidence in the case can only be correct if "charge" and "collect" mean the

same thing. PURA does not define "charge"; therefore, we must give the term its common meaning. *See* Tex. Gov't Code § 311.011(a) ("Words and phrases shall be read in context and construed according to the rules of grammar and common usage.").

"Charge," in the context of PURA Section 54.204(c), means "to fix or ask (a sum) as a fee or payment (= $10 for his services)"; "to record a debt, obligation, or liability against"; "to ask or set a price: ask payment." *Webster's Third New Int'l Dictionary* 377 (2002); *see also The Compact Oxford English Dictionary* 238 (2d ed. 1994) ("Charge" means "to impose claim, demand, or state as the price or sum due for anything."). "Collect," on the other hand, means "to present as due and receive payment for." *Webster's Third New. Int'l Dictionary* 444 (2002); *see also The Compact Oxford English Dictionary* 286 (2d ed. 1994) ("Collect" means "to receive money, to get paid."). There are numerous examples in common usage of the distinction between the terms, but the simplest one is that creditors file suit to collect payment from their debtors, whom they have previously charged for a good or service.[17] *See* Tex. Fin. Code § 392.001 (defining "debt collection" as "an action, conduct, or practice in collecting, or in soliciting for collection, consumer debts that are due or alleged to be due a creditor"). We conclude that a duty to "charge" a uniform rate differs from a duty to "collect" a uniform rate.

CPS Energy contends that the Commission exceeded its authority by imposing a new requirement. We will consider wheth-er the Commission's implied authority under PURA allowed it to enforce the requirement to "charge" a uniform rate by requiring CPS Energy to "collect" a uniform rate. The Commission "is a creature of the legislature and has no inherent authority." *Public Util. Comm'n of Tex. v. GTE-Southwest, Inc.*, 901 S.W.2d 401, 406-07 (Tex. 1995). An agency may exercise only those specific powers that the Legislature has conferred upon it in clear and express language. *Id.* at 407. While the Legislature impliedly intends that an agency should have whatever power is reasonably necessary to fulfill an express duty, the agency may not exercise " 'what really amounts to a new and additional power or one that contradicts the statute, no matter that the new power is viewed as being expedient for administrative purposes.' " *Id.* (quoting *Sexton v. Mount Olivet Cemetery Ass'n*, 720 S.W.2d 129, 137-38 (Tex. App.—Austin 1986, writ ref'd n.r.e.) (citations and emphasis in original omitted)).

When determining whether authority is implied for the Commission to enforce a requirement to collect a uniform rate, we consider the purpose of charging a uniform rate. *See id.* at 408. The requirement to charge a uniform rate is a method of ensuring that MOUs do not discriminate among attaching entities when charging pole-attachment rates. It is not a requirement imposed upon each attaching entity to pay the same charged amount. As a result, it is not necessary to imply authority for the Commission to enforce a requirement for MOUs to make "a serious effort to collect a uniform rate." *See id.*

---

17. There are also numerous sections of PURA that distinguish between "charging" a rate and "collecting" a rate. *See, e.g.*, Tex. Util. Code §§ 31.002(15) (" 'Rate' includes a compensation ... that is directly or indirectly demanded, observed, *charged, or collected* by an electric utility...."), 39.302(7) (" 'Transi-tion charges' means nonbypassable *amounts to be charged* for the use or availability of electric services, approved by the commission under a financing order to recover qualified costs, *that shall be collected* by an electric utility....") (emphases added).

The Commission noted in its Final Order that "[b]y imposing the uniform-rate requirement, the legislature intended to prevent anti-competitive discrimination in the telecommunications industry." The Commission concluded that CPS Energy's failure to take what it described as "timely action" to collect the full amount CPS Energy had invoiced AT&T equated to not charging a uniform rate and resulted in anti-competitive discrimination. The Commission's conclusion misplaces the fault for any anti-competitive effect that may have occurred. *AT&T's* decision to not pay the invoiced rate means they paid a lower rate than TWC during that time period, but the timing of CPS Energy's collection efforts is not the cause of that effect. Whether an attaching entity pays the rate charged is a matter not entirely within an MOU's control. While an MOU can make collection efforts, whether those efforts are successful is also not entirely within the MOU's control. Moreover, many different factors may affect a collecting entity's analysis of when and how to pursue collection, and therefore, attempting to identify "meaningful action" to collect in the absence of legislative guidance appears arbitrary and capricious. *See Charter Med.*, 665 S.W.2d at 454 (holding that agency acts arbitrarily and capriciously when it improperly bases its decision on non-statutory criteria).

The collusion and fraud scenarios suggested by AT&T would present a different case than the case before us. An argument could be made that an MOU who entered into side agreements with certain attaching entities for a different rate or who made *no* effort to collect from an attaching entity who was not paying the charged rate was not in fact charging a uniform rate. That is not the case presented here. Section 54.204(c) incorporates the detailed procedure from federal law and the FCC rules for ensuring that the rate charged is not more than a just and reasonable maximum rate, and it provides that the MOU must uniformly charge that rate. We conclude that the Commission exceeded its statutory authority by adding a requirement not found in the statute to make a "serious effort to collect a uniform rate." *See id.* We sustain CPS Energy's issue, and we reverse the portion of the district court's decision upholding the Commission's conclusion.

## V. Application of PURA Section 54.204(b)

In its fifth issue, CPS Energy contends that the district court erred by affirming the Commission's conclusion that CPS Energy violated PURA Section 54.204(b). CPS Energy asserts that PURA Section 54.204(b) does not apply here because it contains a condition precedent that affects whether it applies and the condition precedent did not occur in this case. Consequently, it argues for the reversal of the district court's decision affirming the following Commission conclusions:

COL 8A PURA § 54.204(b) is applicable to this docket.

COL 9 For September 7, 2005 through test year/billing year 2009/2010, CPS Energy did not comply with non-discrimination provisions of PURA § 54.204(b) because the rates and terms offered to TWC and AT&T were not the same.

COL 9A PURA § 54.204(b) requires that the utility pole-attachment terms and rates offered by a municipally owned utility not be discriminatory in favor of or against a CTP. This requirement applied to all of CPS Energy's pole attachment contracts following September 7, 2005, regardless of whether those contracts had been modified since the 1995 enactment of what is presently PURA § 54.204(a) and (b). CPS Energy offered different

rates and terms to AT&T and TWC for the period of September 7, 2005 through 2010, and therefore violated PURA § 54.204(b).

The Commission, AT&T, and TWC all respond that the Commission's application of PURA Section 54.204(b) accords with the statute's plain language and should be upheld.

Section 54.204(b) provides that:

> (b) *In granting consent,* a franchise, or a permit *for the use of a* public street, alley, or *right-of-way* within its municipal boundaries, a municipality or *municipally owned utility may not discriminate* in favor of or against a certificated telecommunications provider *regarding:*
>
> (1) *municipal utility pole attachment* or underground conduit *rates or terms*; or
>
> (2) the authorization, placement, replacement, or removal of a facility in a public right-of-way and the reasonable compensation for the authorization, placement, replacement, or removal regardless of whether the compensation is in the form of:
>
> (A) money;
>
> (B) services;
>
> (C) use of facilities; or
>
> (D) another kind of consideration.

Tex. Util. Code § 54.204(b) (emphases added). Within its Final Order, the Commission concluded that "[p]ole attachment agreements, such as the agreements at issue in this case, are consents for the use of CPS Energy's poles *within its rights-of-way.* The Commission concludes that by entering into pole-attachment agreements, CPS has granted consent for use of its rights-of-way for purposes of PURA § 54.204." (Emphasis added.) In other words, the Commission concluded that by granting consent to attach to its poles,

which are located in its rights-of-way, CPS Energy is necessarily granting consent to use those rights-of-way when it enters into pole-attachment agreements. Based on this interpretation of the statutory language, the Commission determined that Subsection (b) applies in this case. The Commission further concluded that CPS Energy violated Subsection (b) because it offered different rates and terms to AT&T (a CTP) and TWC (not a CTP) for the period of September 7, 2005 through 2010.

CPS Energy makes several arguments challenging the Commission's interpretation of the introductory clause in Subsection (b). First, CPS Energy contends that the Legislature intended Subsection (b) to ensure that neither the City of San Antonio nor CPS Energy leverages the City's control over its rights-of-way in exchange for discriminatory pole-attachment rates or terms when negotiating pole-attachment agreements. It further argues that if the Commission's interpretation is correct, pole-attachment rates and terms would always include a consent to access rights-of-way, which would render the condition precedent superfluous. Second, CPS Energy argues that the Commission erroneously conflated the Legislature's intent when adopting PURA Section 66.010 with its intent when amending Section 54.204(b), that other sections of PURA contradict the Commission's finding that a pole-attachment agreement necessarily grants consent to use a municipality's rights-of-way for purposes of Section 54.204, and that the federal definition of "pole attachment" distinguishes between attachment to a pole and attachment to a right-of-way, *see* 47 U.S.C. § 224(a)(4) (" '[P]ole attachment' means *any attachment* by a cable television system or provider of telecommunications service *to a pole,* duct, conduit, *or right-of-way* owned or controlled by a utility." (emphases added)). Third, CPS Energy also asserts that it did not grant con-

sent for use of its rights-of-way and that the record evidence shows that its pole-attachment agreements did not convey the right to access rights-of-way. Finally, CPS Energy contends that even if Section 54.204(b) applies, the record evidence does not support a finding that it engaged in prohibited discriminatory treatment because (1) different terms are not inherently discriminatory and (2) CPS Energy charged uniform rates.

## A. The introductory phrase is not superfluous

As a preliminary matter, we disagree with CPS Energy's characterization of the introductory clause of Subsection (b) as a "condition precedent." "A 'condition precedent' is something that must occur before something else can occur." *Garner's Dictionary of Legal Usage* 197 (3d ed. 2011). The phrase, "[i]n granting consent ... for the use of a ... right-of-way within its municipal boundaries," describes the circumstances under which an MOU is prohibited from discriminating for or against a CTP, but it does not describe something that must happen before something else may happen. We agree with CPS Energy that the Legislature wanted to ensure that neither the City of San Antonio nor CPS Energy leverages the City's control over its rights-of-way in exchange for discriminatory pole-attachment rates or terms. We also agree with the Commission that when CPS Energy grants consent or a license to attach to its poles, which are located in its rights-of-way, CPS Energy is necessarily granting consent to use those rights-of-way. These two ideas are not mutually exclusive. The introductory phrase in Subsection (b) describing the circumstances under which discrimination is prohibited does not become superfluous merely because when CPS Energy grants consent to attach to its poles, it necessarily grants consent to

its rights-of-way. The phrase enumerates the various scenarios in which a municipality or an MOU might use its ability to grant access to rights-of-way as leverage to get agreement to discriminatory terms. The fact that an MOU's entering into a pole-attachment agreement is a circumstance that fits into the list of circumstances under which an MOU cannot require discriminatory rates and terms in exchange for access to its poles does not make the description of the applicable circumstances superfluous.

## B. Other PURA sections and the federal definition do not render the Commission's conclusion incorrect

We find CPS Energy's arguments about other sections of PURA and the federal definition of "pole attachment" to be unpersuasive. CPS Energy relies on PURA Section 54.205 and Section 66.002 to assert that the Legislature intended a distinction between access to poles and access to rights-of-way that renders invalid the Commission's conclusion that they are one and the same for purposes of Section 54.204(b). Section 54.205 allows municipalities to retain their rights to control access and receive reasonable compensation for that access, but it distinguishes between access to rights-of-way and access to "other public property." Tex. Util. Code § 54.205. CPS Energy asserts that "public property" must encompass poles and that means that the two rights of access are distinct. Even if, however, we accept CPS Energy's interpretation that the two rights of access are distinct rights, that interpretation does not preclude the Commission's conclusion that right-of-way access is presumed when consent is given to access poles. Section 66.002, found in the PURA chapter concerning state-issued cable and video franchises, defines "public right-of-way" as "the area on, below, or above a public roadway, highway, street, public

sidewalk, alley, waterway, or utility easement in which a municipality has an interest." *Id.* § 66.002(8). Similarly, this definition's inclusion of "utility easement" in the definition of "public right-of-way" does not preclude the Commission's conclusion that access to poles would necessarily include access to a utility's easement.

CPS Energy also contends that PURA Section 66.010(b), which requires municipalities not to discriminate against holders of state-issued certificates of franchise authority concerning "(1) the authorization or placement of a communications network in a public right-of-way; (2) access to a building; or (3) a municipal utility pole attachment term," shows that the Legislature distinguishes between pole-attachment terms and authorization to use a municipality's rights-of-way. *See id.* § 66.010 (establishing in Subsection (a) that municipalities must allow state-issued certificate holders to have nondiscriminatory access to public right-of-way). Section 66.010 concerns nondiscriminatory access for certificate holders installing, constructing, and maintaining communications networks. Again, simply because the Legislature drew a distinction between pole-attachment terms and authorization to use rights-of-way in a different anti-discrimination provision enumerating circumstances in which a municipality may not discriminate does not preclude the Commission's conclusion that CPS Energy's pole-attachment agreements here necessarily included consent to use CPS Energy's rights-of-way.[18]

CPS Energy also contends that the FCC's definition of "pole attachment" supports its contention that attachments to poles do not inherently involve attachments to a right-of-way. The FCC defines a "pole attachment" as "any attachment by a cable television system or provider of telecommunications service to a pole, duct, conduit, or right-of-way owned or controlled by a utility." 47 U.S.C. § 224(a)(4). The FCC's expansive definition of attachments that are "pole attachments" as including attachments to both poles and rights-of-way does not render incorrect the Commission's conclusion that CPS Energy's consent to allow attachment to poles necessarily includes access to the right-of-way where the pole stands.

**C. Substantial evidence supports the Commission's conclusion that CPS Energy granted consent to use its rights-of-way when it granted consent to attach to its poles**

■ CPS Energy asserts that it did not grant consent for use of its rights-of-way and that the record evidence shows that its pole-attachment agreements did not convey the right of access to its rights-of-way. We disagree. The Commission concluded that the pole-attachment agreements in this case are necessarily "consents for the use of CPS Energy's poles within its rights-of-way." CPS Energy has not explained how a licensee who has been granted permission to access the pole could do so without entering the right-of-way. The Commission's interpretation of Section 54.204(b) does not conflict with the statute's plain language.

---

18. We also find unpersuasive CPS Energy's complaint that the Commission "conflated" PURA Sections 54.204(b) and 66.010. The Commission's Final Order merely cites Section 66.010 as an example of the Legislature's "ongoing concern [also expressed in Section 54.204(b)] about encouraging competition by barring discrimination regarding pole-attach-

ment rates and terms." The Commission did not conclude that Section 66.010 applied to this proceeding, and its statement about the Legislature's "ongoing concern" is not incorrect merely because Section 66.010 was enacted in 2005 and the introductory phrase in Section 54.204(b) has been in place since 1997.

The record evidence reasonably supports the Commission's interpretation. The agreement between CPS Energy and TWC does not speak explicitly to a license to use CPS Energy's rights-of-way. Instead, the City, acting through CPS Energy, agrees to grant to TWC "to the extent it may lawfully do so . . . revocable, nonexclusive *licenses to attach portions of [TWC's] facilities to [CPS Energy's] poles*, where reasonably available and where such use will not interfere with [CPS Energy's] service requirements or the use of its facilities by others" to facilitate TWC's provision of service within CPS Energy's service area "in which [TWC] has been franchised by appropriate authorities." (Emphasis added.) The right to use CPS Energy's rights-of-way to access the poles is not explicitly granted, but it is necessarily implied.

To ensure the appropriateness of any pole attachment, the agreement further provides that TWC must submit to CPS Energy evidence:

> *of a franchise or other authority authorizing [TWC] to erect and maintain . . . its facilities* within the public streets, highways, alleys, utility easements, other thoroughfares, and on private property situated in [CPS Energy's] service area, *and of any other necessary consent from federal, state, municipal, or other public authorities, and from the owners of private lands and property involved* to construct and maintain [TWC's] facilities at the location of [CPS Energy's] poles which [TWC] desires to use.

(Emphases added.) In other words, the agreement requires TWC to provide CPS Energy with evidence of its authorization from the State or federal authorities to establish its network and of any consent required from *other* public authorities or private property owners to access the loca-

tion of CPS Energy's poles. It doe not require evidence of consent from the City (a party to the agreement) for TWC to use the City's rights-of-way.

The "Joint Use Pole Contact Agreement" between CPS Energy and AT&T, similarly implies that AT&T will be able to use CPS Energy's rights-of-way to access CPS Energy's poles. The Joint Use Pole Contact Agreement is between the City of San Antonio, acting by and through CPS Energy, and AT&T, and as its name indicates, it governs each party's attachment to the other party's poles. Accordingly, the agreement is broadly worded because the language must cover AT&T's obligation to cooperate in obtaining rights-of-way, as well as CPS Energy's obligation to do so. The agreement provides that while the parties "will cooperate as far as may be practicable in obtaining rights of way' for both parties on joint poles, [and] no guarantee is given by [either party] of permission from property owners, municipalities or others for the use of its poles by the [other party]. . . ." Again, the implication is that each party is granting consent to use its own rights-of-way, to the extent it is able to do so, and that each party will cooperate in obtaining consents from *other parties* where necessary to do so. The City is obviously entitled to consent to use of its own rights-of-way. The plain language of the statute and the record evidence support the Commission's interpretation of Section 54.204(b). Therefore, we conclude that the Commission's conclusion that Section 54.204(b) applies in this proceeding to CPS Energy's actions is correct.

**D. The record evidence supports in part the Commission's conclusion that CPS Energy did not comply with Section 54.204(b)'s nondiscrimination provision**

 CPS Energy contends that even if Section 54.204(b) applies, the Commission

erred by concluding that it did not comply with Subsection (b)'s prohibition of discrimination in favor of a CTP because it offered AT&T and TWC different rates and terms. CPS Energy first challenges the Commission's conclusion that CPS Energy violated Subsection (b) by offering AT&T and TWC different pole-attachment terms. CPS Energy asserts that, unlike Subsection (c), which requires MOUs to charge a uniform pole-attachment rate, Subsection (b) requires merely that terms be nondiscriminatory, not uniform. The Commission's Final Order states that after September 7, 2005, the terms CPS Energy offered to AT&T and TWC were different. TWC had to pay a permit-application fee and wait for approval to attach to new poles, while AT&T was not required to notify CPS Energy when it attached to a pole or to pay a permit-application fee. In addition, the Commission noted that CPS Energy used a statistical sampling method to bill AT&T while other entities are billed based on pole-contact applications, and this created a margin of error that could be discriminatory against AT&T. The Commission concluded that therefore, "because CPS Energy offered terms to TWC that discriminated in favor of AT&T, ... CPS Energy violated PURA § 54.204(b) for the period of September 7, 2005 through the end of 2010."

CPS Energy correctly states that different terms are not inherently discriminatory. It argues that its contractual terms with AT&T and TWC differ because AT&T and TWC offered different consideration for their pole-attachment agreements since CPS Energy's agreements with AT&T in part allowed CPS Energy to attach to AT&T's poles. TWC owns no poles to which CPS Energy could attach. CPS Energy suggests that to the extent the FCC's rules and orders serve as a guide to the Commission under PURA § 54.204(c) for enforcing the maximum

rate, we should consider the FCC's statement that good-faith negotiations of pole-attachment agreements do not require use of identical rates, terms, or conditions if the differences are "based on legitimate exchanges of consideration," not on discriminatory factors. *Reconsideration Order*, 16 FCC Rcd. at 12113 ¶ 14. We note that although PURA Section 54.204 does not require the Commission to follow the FCC's guidance when applying Subsection (b), even if it did, the FCC states that it "will carefully scrutinize any differences in rates, terms and conditions in any complaint action, and the burden will be on the utility to demonstrate that any differences are nondiscriminatory." *Id.*

In this case, there is a reasonable basis in the record for the Commission's conclusion that the difference in terms was discriminatory against TWC. *See Charter Med.*, 665 S.W.2d at 452. TWC presented evidence about the different terms and their competitive implications. TWC's witnesses testified that in addition to incurring the expense and delay of applying for a permit to attach to CPS Energy's poles, it also was required to pay for the rearrangement of other entities' facilities on a pole if space had to be made to accommodate TWC's attachment. AT&T, on the other hand, did not have to apply for a permit or even provide notice before making an attachment, and it did not have to pay to rearrange TWC's facilities when it sought to make a new attachment. Substantial evidence supports the Commission's conclusion that CPS Energy violated Section 54.204(b) because the different terms offered to AT&T discriminated in AT&T's favor. *See id.* (explaining that agency's decision is upheld as long as some reasonable basis exists in the record for the agency action). Therefore, we affirm in part the district court's upholding of the Commission's conclusions of law 9 and 9A

that CPS Energy violated Section 54.204(b) by offering different terms to AT&T and TWC.

However, given our conclusion in the prior section that the Commission does not have authority to equate "charge" and "collect," we must reverse in part the district court's affirmance of the Commission's conclusions of law 9 and 9A. CPS Energy was required to charge a uniform rate beginning September 1, 2006. Therefore, non-uniform rates from September 7, 2005 through September 1, 2006 do not establish discrimination. The record evidence shows that CPS Energy began charging a uniform rate in January 2007. Therefore, there is no evidence to support a finding that CPS Energy violated Subsection (b)'s nondiscrimination provision by charging different rates from 2007 through 2010. The only period during which CPS Energy charged a non-uniform rate was the four-month period from September 1, 2006 through December 31, 2006. CPS Energy asserts that it corrected the four-month error in its billing by subsequently retroactively charging AT&T the uniform rate for that period. The Commission concluded, however, in conclusion of law 10 that "CPS Energy's action in retroactively billing AT&T the same amount it billed other attachers did not correct its failure under PURA § 54.204(c) to charge AT&T the same rate as other attachers for the period of September 1, 2006 through December 31, 2006." The Commission explained that the competitive damage would have already occurred.[19] The Commission had the evidence of the different rates and CPS Energy's delay in retroactive billing before it, which provided it with a reasonable basis to conclude that CPS Energy's different rates for the four-month period at the end of 2006 violated Section 54.204(b).[20] See id. Accordingly, we reverse the district court's affirmance of the Commission's conclusion that CPS Energy violated Section 54.204(b) by charging different rates, except for the time period from September 1, 2006 through December 31, 2006. We overrule in part and uphold in part CPS Energy's fifth issue.

## VI. 2011 FCC amendments

While the enforcement action brought by CPS Energy was pending before the Commission, the FCC amended its rules effective June 8, 2011. These amendments served to exclude depreciation, taxes, and rate-of-return expenses from the pole-attachment fees. The result of the amendments is a 66% reduction of the maximum pole-attachment rate for urban areas and a 44% reduction for non-urban areas. Although the FCC's adoption of the amendments was not originally before the Commission, the parties asked the ALJs to certify the following question to the Commission:

> Do the requirements of PURA § 54.204(c) incorporate revisions to the

19. We note that no party has challenged the district court's holding that the Commission does not have jurisdiction to determine whether discrimination necessarily caused harm.

20. We further note that no party has challenged the district court's holding that "[t]he Commission lacked jurisdiction to make determinations regarding the existence of, or the statute's effect on, disputed private pole attachment agreements...." On motion for rehearing, TWC raised a concern that by considering the contracts in connection with its determination of whether CPS Energy's conduct violated PURA, the Commission somehow determined contract issues that are within the Bexar County District Courts' exclusive jurisdiction. The Commission made determinations about whether CPS Energy's conduct violated PURA, and no party asserted that the Commission lacked jurisdiction to do so. Consequently, our review is limited to the issues over which the Commission had jurisdiction.

FCC's rules under 47 U.S.C. § 224(e) that are adopted subsequent to September 1, 2006, and if so, when do any such revisions become applicable to PURA § 54.204(c)?

The Commission ultimately opined that it was the intent of the Texas Legislature that these FCC amendments be incorporated by Section 54.204.

The Commission's findings of fact 84-87 and conclusions of law 26 and 27 set forth the Commission's position on the FCC amendments. The findings of fact outline the changes made by the amendments and set forth a methodology for CPS Energy to use going forward when calculating the maximum-allowable rate. The two conclusions of law are:

COL 26 Changes in 47 U.S.C. § 224(e) are incorporated into PURA § 54.204 without legislative action.

COL 27 The FCC's June 8, 2011 amendment to 47 C.F.R. 1.1409(e) applies to CPS Energy under PURA § 54.204(c).

CPS Energy appealed the portions of the Commission's Final Order regarding the amendments to the district court, and in its second issue on appeal, it contends that the district court erred by affirming the Commission's conclusion that the FCC's amendments automatically apply to Section 54.204(c). Although the Commission defended its conclusion in district court and in its appellee's brief in this Court, two days before oral argument in this case, the Commission notified the Court that upon further review its position now is that this Court lacks jurisdiction to decide this issue. The Commission asserts that this Court lacks subject-matter jurisdiction to rule on the Commission's advisory opinion on a matter that is not ripe. The parties submitted post-submission briefing to the Court on this issue.

CPS Energy now also concedes that this issue is unripe. However, CPS Energy and the Commission differ in their views of whether this results in a reversal. The Commission asserts that as a state agency, it is authorized to issue advisory opinions giving advice to the parties it regulates, but that this Court lacks jurisdiction to consider the issue and thus should not reverse the Commission's decision. CPS Energy, on the other hand, asserts that the Commission lacks jurisdiction to issue advisory opinions and that we therefore should find the Commission's determination has no legal effect and reverse the Commission's Final Order on the relevant findings of fact and conclusions of law. AT&T and TWC assert that the issue is in fact ripe because it is a purely legal question brought as a declaratory-judgment action, and consequently, it is not advisory. They thus assert that the district court should be affirmed on this point.

We first address AT&T and TWC's contention that the issue is ripe because it is a purely legal question brought as a declaratory-judgment action, relying on cases brought under the Uniform Declaratory Judgments Act (UDJA), see generally Tex. Civ. Prac. & Rem. Code §§ 37.001-.011. CPS Energy did not file the case under the UDJA, however. It filed the case as a petition for enforcement under PURA Section 54.204. Moreover, an action under the UDJA could only be brought in district court, not at the Commission. See id. § 37.003 (establishing power of courts to render judgment). Accordingly, the case law interpreting the UDJA relied upon by AT&T and TWC is inapplicable to this case.

We next consider our own jurisdiction over this issue. The Commission asserts that we lack subject-matter jurisdiction over this portion of its Final Order because the Commission merely made an

advisory statement about what its position on the FCC amendments would be going forward and the matter of the application of the FCC amendments is not ripe. The Commission contends that its statement has no bearing on the current controversy and could only apply to future complaints that have yet to occur. We agree with the Commission that CPS Energy's appeal of this issue is not ripe.

 We may not give advisory opinions. *Patterson v. Planned Parenthood of Hous. & Se. Tex., Inc.*, 971 S.W.2d 439, 443 (Tex. 1998) ("The courts of this state are not empowered to give advisory opinions."). "This prohibition extends to cases that are not yet ripe," that is, cases whose "resolution depends on contingent or hypothetical facts, or upon events that have not yet come to pass." *Id.* The ripeness doctrine analyzes the timing of a dispute and whether it has " 'matured to a point that warrants decision.' " *Perry v. Del Rio*, 66 S.W.3d 239, 249 (Tex. 2001) (quoting 13A Charles Alan Wright, Arthur R. Miller, & Edward H. Cooper, Federal Practice and Procedure § 3532, at 104 (2d ed. 1984, 2001 Supp.)). Under the doctrine, we examine " 'whether the case involves uncertain or contingent future events that may not occur as anticipated, or indeed may not occur at all.' " *Id.* (quoting 13A Wright, § 3532, at 104 (2001 Supp.)). When assessing ripeness, we are required " 'to evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration.' " *Perry*, 66 S.W.3d at 250 (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 149, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967)).

In this case, the Commission, at the parties' request, issued an advisory statement concerning its position on the legal question of the application of the 2011 FCC amendments going forward. The parties concede and the record supports a conclusion that this dispute was based on CPS Energy's Billing Years 2005-2010. No evidence was proffered regarding CPS Energy's pole-attachment rates in 2011, nor were allegations made in the proceedings below that CPS Energy's 2011 pole-attachment rates were discriminatory or otherwise failed to comply with PURA Section 54.204. In similar situations involving what is essentially a pre-enforcement suit, courts have concluded that the controversy is ripe for review only if an enforcement action is not merely remote, conjectural, or hypothetical, but imminent or sufficiently likely. *See Trinity Settlement Servs., LLC v. Texas State Secs. Bd.*, 417 S.W.3d 494, 506 (Tex. App.—Austin 2013, pet. denied); *see also TXU Elec. Co. v. Public Util. Comm'n of Tex.*, 51 S.W.3d 275, 287-88 (Tex. 2001) (per curiam) (Owen, J., concurring) (holding that Commission's decision that an adjustment for loss on reacquired debt should be made in future proceedings was an advisory and premature finding); *Railroad Comm'n of Tex. v. CenterPoint Energy Res. Corp.*, No. 03-13-00533-CV, 2014 WL 4058727, at *3 (Tex. App.—Austin Aug. 14, 2014, no pet.) (mem. op.) (holding that agency order requiring utility to meet certain evidentiary requirements in future proceedings did not establish imminent or sufficiently likely enforcement). As for the element of hardship if judicial review is withheld until enforcement, CPS Energy faces no sanction or penalty for failure to comply with the Commission's statement regarding the 2011 FCC amendments, and it has not demonstrated how its rates would actually be affected. *See CenterPoint Energy Res.*, 2014 WL 4058727, at *4. "In the administrative-law context, . . . avoiding premature litigation over administrative determinations prevents courts from 'entangling themselves in abstract disagreements over administrative policies' while simultaneously allowing the agency to perform its functions unimped-

ed." *Trinity Settlement Servs.*, 417 S.W.3d at 506 (quoting *Patterson*, 971 S.W.2d at 443).

Whether the 2011 FCC amendments apply to a future proceeding should await resolution in such a proceeding. *See TXU Elec. Co.*, 51 S.W.3d at 288. We conclude that this issue is not ripe, and therefore, we do not have jurisdiction to consider CPS Energy's complaint that the district court affirmed the Commission's conclusion that the 2011 FCC amendments apply to CPS Energy on a going-forward basis.[21] We dismiss this issue for want of jurisdiction, and because the district court likewise lacked jurisdiction to consider this issue, we vacate the portion of its decision affirming the Commission's conclusion.

### CONCLUSION

For all the reasons stated above, we affirm in part and reverse in part the district court's judgment. We affirm the portion of the district court's judgment affirming the Commission's conclusions in its Final Order that (1) it has the jurisdiction to review and modify an MOU's inputs, including defaults and rebuttable presumptions, used to calculate the maximum pole-attachment rate; (2) the FCC's default rate of return was the appropriate input for Billing Years 2006-2010; (3) PURA Section 54.204(b) applies to this proceeding; and (4) CPS Energy violated PURA Section 54.204(b)'s nondiscrimination provision by offering different pole-attachment terms to AT&T and TWC and by offering different rates to AT&T and TWC from September 1, 2006 through December 31, 2006. We also affirm the portion of the district court's judgment reversing the Commission's decision to use a rate other than the default rate of return for Billing Year 2005.

We reverse the portion of the district court's judgment reversing the Commission's conclusion that CPS Energy's average number of attaching entities is three. We also reverse the portion of the district court's judgment affirming the Commission's conclusions that (1) CPS Energy violated PURA Section 54.204(c) by "making no serious effort to collect a uniform rate" and (2) CPS Energy violated Section 54.204(b) by charging different rates to AT&T and TWC (except for that portion of the judgment covering the period from September 1, 2006 through December 31, 2006). We dismiss the issue of whether the 2011 FCC amendments apply to CPS Energy on a going-forward basis for lack of jurisdiction, and we vacate the portion of the district court's judgment affirming the Commission's conclusion that the 2011 amendments apply on a going-forward basis to CPS Energy.

We remand this case to the Commission for further proceedings consistent with this opinion.

Justice Pemberton not participating

---

**21.** Likewise, the issue of whether the Commission properly issued its statement about its position on the future application of the amendments is not ripe, and we do not have jurisdiction to consider it.