# Supreme Court of Texas

No. 24-0794

Spectrum Gulf Coast, LLC,

*Petitioner,*

v.

City of San Antonio, acting by and through
City Public Service Board,

*Respondent*

On Petition for Review from the
Court of Appeals for the Thirteenth District of Texas

**Argued February 11, 2026**

JUSTICE YOUNG delivered the opinion of the Court.

Justice Bland and Justice Sullivan did not participate in the decision.

The legislature has imposed various statutory limitations on how much public utilities may charge telecommunications providers that wish to attach equipment to a utility's poles. The sole question before us is whether the parties' contract allows them to enforce these statutory requirements.

We hold that it does. The parties promised each other that, "at all times," they would "observe and comply with . . . all laws, ordinances, and

regulations which in any manner affect the rights and obligations of the parties hereto under this [a]greement" and that the agreement itself was made "subject to" those "laws, ordinances, and regulations." This express language confirms that the parties anticipated legal changes that would affect their rights—a common and foreseeable circumstance for highly regulated public utilities. The contract's express language also confirms that relevant legal developments would be brought within and made enforceable under the contract.

Because the court of appeals reached a contrary conclusion, we reverse its judgment and remand the case to the trial court.

**I**

CPS Energy, a public utility owned by the City of San Antonio, owns poles that hold lines to distribute electric power to customers. In the normal course of business, other entities—including telephone and cable companies—attach equipment to CPS's pre-existing power poles to provide services in the same area to the same customers. This case's beginnings lie in 1984, when Spectrum's predecessor in interest executed an agreement that allowed it to attach equipment to CPS's poles and thus deliver telecommunications services.

The agreement initially required an annual payment of $3.75 for every pole used in this way. An agreed-upon escalator clause authorized potential annual rate increases. The agreement further provided that the parties

> shall at all times observe and comply with, and the provisions of the [a]greement are subject to, all laws, ordinances, and regulations which in any manner affect the rights and obligations of the parties hereto under this [a]greement, so long as such laws, ordinances or regulations remain in effect.

2

The agreement also allowed either party to terminate the agreement at any time with six months' notice. In January 1987, CPS and AT&T entered into a similar agreement, although without an escalator clause.

Over the years, Spectrum continued to pay an increasing pole-attachment rate, while AT&T continued to pay the circa-1984 rate of $3.75 per pole. In 2007, CPS began invoicing AT&T *and* Spectrum for what it viewed as the maximum allowable rate. AT&T kept paying $3.75 per pole; Spectrum paid its invoiced rate.

Spectrum sued CPS in late 2008 seeking damages and declaratory relief based on CPS's alleged breach of contract and violations of pricing requirements in the Public Utility Regulatory Act ("PURA"). In particular, PURA's 2005 amendments prohibit municipalities and municipally owned utilities from discriminating for or against telecommunications providers, including as to terms and pole-attachment rates. *See* Tex. Util. Code § 54.204(b)–(c).

CPS filed a plea in abatement asserting that the Public Utility Commission had primary jurisdiction. The trial court sustained the plea and abated the action pending a further order. In January 2009, CPS filed a petition that asked the commission to (1) order both AT&T and Spectrum to pay CPS allegedly overdue and future pole-attachment fees and (2) find that the method used by CPS was reasonable and consistent with PURA.

The commission ultimately ordered CPS to comply with § 54.204 going forward. The trial court affirmed this decision. The Third Court of Appeals reversed, holding that because CPS had *invoiced* Spectrum and AT&T at the same rate, its ineffective collection efforts did not violate § 54.204. *CPS Energy v. PUC*, 537 S.W.3d 157, 200 (Tex. App.—Austin

2017), *rev'd in part sub nom. Time Warner Cable Tex. LLC v. CPS Energy*, 593 S.W.3d 291 (Tex. 2019). We reversed that decision, holding that the commission reasonably found a violation based on CPS's lack of a "serious or meaningful effort" to collect the higher rates from AT&T while collecting far more from Spectrum. *Time Warner*, 593 S.W.3d at 296. We did not address whether CPS's conduct violated § 54.204(c), which cabins pole-attachment rates to a federal maximum and requires municipally owned utilities to charge "a single, uniform" pole-attachment rate.

On remand, Spectrum amended its petition to allege that CPS's discriminatory rates violated § 54.204(b) and (c). This failure to comply with existing law, it alleged, breached the parties' agreement and unjustly enriched CPS. CPS amended its counterclaims and moved for partial summary judgment, alleging that Spectrum breached the agreement by failing to pay the invoiced rate between 2009 and 2016. The trial court granted CPS's motion for partial summary judgment and dismissed Spectrum's statutory and unjust-enrichment claims, but it granted summary judgment for Spectrum on its breach-of-contract claim. That court then granted CPS's request for a permissive appeal on the following question, while reserving damages for later proceedings: "Whether CPS Energy breached the parties' agreement by unlawfully imposing discriminatory rates on Spectrum."

For docket-equalization purposes, we transferred the appeal to the Thirteenth Court of Appeals, which reversed the trial court's judgment and held that the 1984 agreement did not "renew[]" each year and thus did not incorporate new statutes into its terms. 727 S.W.3d 206, 213 (Tex. App.—Corpus Christi–Edinburg 2024). Because it held that § 54.204(b) and (c)

4

were not brought within the parties' contractual rights or obligations, the court of appeals rejected Spectrum's breach-of-contract claim. *Id.*

**II**

When this case was last before us, CPS asserted that PURA did not even apply to the agreement. It had not raised that argument in the lower courts, though, so we declined to address it. *See Time Warner*, 593 S.W.3d at 296 n.28. On remand, CPS pressed the point and has preserved it for our review. We hold that PURA applies to this agreement between a municipally owned utility and a regulated telecommunications company.

First, § 51.003(4) provides that, "[e]*xcept as otherwise expressly provided* by this title, this title does not apply to . . . community antenna television services." (Emphasis added.) Second, § 54.204(b) commands without caveat that "a municipality or municipally owned utility may not discriminate *in favor of or against a certificated telecommunications provider*" for pole-attachment rates or terms. (Emphasis added.) Third, § 54.204(c) mandates that entities like CPS charge uniform rates and that a

> municipality or a municipally owned utility may not charge any entity, *regardless of the nature of the services provided* by that entity, a pole attachment rate or underground conduit rate that exceeds the fee the municipality or municipally owned utility would be permitted to charge under rules adopted by the Federal Communications Commission under 47 U.S.C. Section 224(e) . . . .

(Emphasis added.)

AT&T is a certified telecommunications utility and certificated telecommunications provider, and Spectrum is a franchised cable operator—and *not* a certificated telecommunications provider. *See* Tex. Util. Code §§ 17.002(3), 51.002(10). Here, a violation of § 54.204(b)—*i.e.*, positive discrimination by CPS *for* AT&T—necessarily affects Spectrum's

position in the competitive marketplace, thus causing provable economic harm.

Beyond that, the "all laws" clause of the parties' agreement goes further. It reaches "all laws, ordinances, and regulations which in *any manner* affect the *rights and obligations* of the parties." (Emphasis added.) Positive discrimination *by the monopoly* (CPS) in a closed market with high barriers to entry and few market participants would unavoidably affect the rates and terms Spectrum would pay for pole-attachments. That is part of what makes a monopoly a monopoly.

In addition, Spectrum long ago abandoned providing solely "community antenna television services" with its allotted space on the poles. CPS knew this, which is why it charged more per year. That is a key part of this suit: CPS alleged years ago that it was charging a proper rate for the *new* services offered, under the *telecommunications* rate. *See* Tex. Util. Code § 54.204(c) (citing 47 U.S.C. § 224(e)). And under the exceptions set forth in § 51.003(1)–(5), this sort of service *would* be covered under PURA. Accordingly, § 54.204(b) covers the alleged violative conduct.

Likewise, § 54.204(c)'s plain text also functions as an exception to the exception found in § 51.003(4). Subsection (c) expressly states that a municipally owned utility "may not charge *any entity, regardless of the nature of the services provided by that entity*, a pole attachment rate . . . that exceeds [the federal rate]." (Emphasis added.) Even if Spectrum provided only community antenna television service, thus remaining a technological dinosaur, § 54.204(c) would still apply a federal ceiling to CPS's charged rate.

## III

We next determine whether the agreement is a contract that incorporates post-1984 legal changes as to the rights and obligations of both parties. The parties heavily debate whether the initial agreement remains intact or whether it "renews" annually, thus creating distinct contracts that embrace new legal obligations that arise with each renewal. We need not address that dispute, however, because even assuming that CPS is correct that there has been only one agreement between the parties, we hold that its "all laws" clause incorporates post-1984 legal changes that affect the parties' rights and obligations.

The agreement's context helps explain its contents. CPS is undisputedly a natural monopoly. Utilities, like insurance companies, are heavily regulated with an eye toward consumer welfare and policing monopolies. The legislature has identified the need for oversight because "the normal forces of competition . . . do not operate" in that context. *Id.* § 11.002(b). Thus, "[p]ublic agencies regulate utility rates, operations, and services as a substitute for competition." *Id.* The history of utilities, with the attendant development of utility law, reflects the rise of a cohesive regulatory framework to foster healthy market competition and disallow monopoly rent-collection. *See, e.g.*, Shelley Welton *et al.*, *Networks, Platforms, and Utilities: Law and Policy* 321–27, 652–54 (2022).

The role of contracts involving utilities, therefore, is somewhat different than in purely private transactions. It is doubtful that a monopolistic utility *could* use contracts to evade utilities laws imposed by the legislature. But as the parties' agreement here reflects, contracts can usefully and sensibly facilitate long-term relationships by accounting for—

not seeking to evade—future regulatory changes. Pole-attachment agreements are premised on an anticipated relationship enduring for decades. One way to help such a relationship endure without discord is to bring new legal obligations within the contract rather than require its termination or continual renegotiation whenever such obligations arise.

This context helps explain the parties' mutual commitment "at all times [to] observe and comply with . . . all laws . . . which in any manner affect the rights and obligations of the parties . . . so long as such laws . . . remain in effect." This broad provision reflects that the parties in 1984 anticipated *future* legal changes. Of course they did: they were as aware as anyone of the intensely regulated nature of utilities. The parties had the right to terminate the agreement with six months' notice, but otherwise, the contract prevented the need for constant renegotiation by embracing the shared obligation of complying with the law. "All laws" and "all times" implicate whatever laws apply at any point during the contract's life, not just those in force at its inception. "[S]o long as" those laws "remain in effect" can only mean that previously operative laws that no longer have force are to be disregarded, while whatever law takes their place is to be followed.

The parties all seem to recognize that this contract was intended to endure. They knew that its subject matter was volatile and dynamic. The text to which they agreed confirms that they were sensibly anticipating the inevitable winds of legal change. Nothing else in the agreement's text—including other provisions that assign specific obligations to one party or the other or remove doubt about whether particular topics fall within the parties' general promise to obey all laws at all times—comes

8

close to displacing that forward-looking commitment.

Thus, the agreement envisions the applicability of subsequent PURA amendments, including Utilities Code § 54.204(b) and (c). This Court has already held that § 54.204(b) prohibits discriminatory charging and collecting of rates. *Time Warner*, 593 S.W.3d at 295. The record demonstrates that CPS charged Spectrum and AT&T the same rate but collected the higher rate only from Spectrum. As we concluded in *Time Warner*, this constitutes discrimination under subsection (b). Spectrum also alleges a violation of subsection (c), which bars charging above the incorporated federal ceiling. Spectrum therefore may proceed with its breach-of-contract claim based on CPS's alleged violation of its obligation to comply with the relevant laws in effect. To that end, we reverse the judgment of the court of appeals and remand the case to the trial court for further proceedings.

Evan A. Young
Justice

**OPINION DELIVERED:** April 10, 2026

9